EDWARD E. PORTERFIELD, Respondent, v. AMER-
ICAN SURETY COMPANY OF NEW YORK,
a Corporation, Appellant.

Kansas City Court of Appeals, January 6, 1919.

1. BONDS: Premium: Agent's Commission. Plaintiff was employed
to procure the bond, or a part thereof, for defendant on the con-
tract to build the Missouri State Capitol and was to receive thirty-
five per cent of the original and all renewed premiums received
by defendant as long as the bond was in force. He succeeded in
getting one-third of said bond which was executed by the defend-
ant. The contractor agreed to pay the original premium for one
year and a like sum annually, in advance, until the surety was re-
leased. The completion of the building was delayed for various rea-
sons and extensions were lawfully granted. The defendant volun-
tarily agreed to waive the payment of premium for the last year
the bond was in force. This action was brought for the broker's
proportion of the commission for said year. It is *held* that under
the facts as disclosed by the evidence the defendant is liable to
plaintiff for his proportion of said premium, notwithstanding it was
not received by defendant.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,*
Judge.

AFFIRMED.

*Warner, Dean, McLeod & Langworthy* for appellant.

*Henry L. Jost* and *Mord M. Bogie* for respondent.

TRIMBLE, J.—This is an action to recover un-
paid broker's commissions claimed to be due under a
contract made by the American Surety Company with
an insurance broker, Edward E. Porterfield, Jr., rela-
tive to the latter's procuring, and placing with defend-
ant, the contract or right to furnish any part of the
Bond required of the contractor selected to erect the
new Missouri State Capitol.

After the broker had performed his part of the
contract and, has received from defendant a part of

his commissions, he, for a valuable consideration, assigned all commissions due and to become due under said broker's contract to his father, Edward E. Porterfield, the plaintiff herein. After this assignment, which was on July 28, 1916, the defendant paid to the plaintiff, as assignee of his son, the commissions due and accrued up to November 28, 1916, but refused to pay any commissions claimed as due and accruing for the year following said last named date. This suit was brought to enforce payment thereof, the petition being filed after the expiration of said year. Plaintiff obtained a verdict and judgment for the full amount demanded with interest from November 28, 1916. Defendant appealed.

The Forty-sixth General Assembly of Missouri by an Act approved March 24, 1911 (Laws 1911, p. 108), authorized the erection of a State Capitol and created a "State Capitol Commission Board" with power to prepare plans, submit bids and award a contract for the erection of said building; all of which things were duly and regularly done, and the "John Gill and Sons Company,' a corporation, was awarded the contract. The law provided, and the contract required, that the contractor give a bond for the faithful performance of its contract, the latter fixing the penal sum of the bond to be given at one million, three hundred and fifty thousand dollars. The contract was formally awarded to said John Gill & Sons Company November 21, 1913.

Prior to and at this time young Porterfield was busy on his own account as an insurance broker, endeavoring to secure the right to furnish said bond. With matters in this shape, Valentine, the resident Vice President of the defendant at Kansas City, communicated with young Porterfield over the telephone and the latter was employed to get the bond or any part thereof for the defendant Surety Company. This telephone contract was on the 25th of November, 1913, confirmed by a letter from said Valentine which, among other things, stated that "if this Company acts as

surety or co-surety on such bond procured by you, you will be paid a commission of thirty-five per cent (35%) on the original premium and all renewal premiums received by this Company as long as the bond remains in force. You to receive commissions as above whether your connection with this Company continues throughout the life of the said bond or not.'' (It may be well to here state that in the telephone conversation Valentine had tried to also engage young Porterfield as the Company's regular agent but the latter would not close a contract on that matter until he had first closed a separate and distinct broker's contract relative to the procuring of the aforesaid State Capitol Bond. Afterwards and on December 4, 1913, young Porterfield entered into a contract whereby he became the defendant's regular agent, but it is manifest that the two contracts are wholly separate and distinct and have nothing whatever to do with each other. And the services under the broker's contract were rendered before the agency contract was entered into.)

There is no question but that young Porterfield performed his part of the broker's contract and succeeded in obtaining one-third of said bond to be placed with the defendant Surety Company. Neither is there any controversy over the fact that the annual premiums charged by and paid to said defendant was $4517 and thirty-five per cent. of this sum or $1581 was paid by defendant each year to young Porterfield and his assignee up to November 28, 1916, as hereinabove stated.

The application to the defendant Surety Company for the bond in question, which was the contract the broker was to obtain for defendant, was signed by the Contractor on November 26, 1913. In it the Contractor agreed and bound itself to pay in advance to defendant the original premium or charge for executing such obligation and continuing the same in force for one year, and that it would ''thereafter pay a like sum, annually, in advance, until the Surety shall be discharged and released from any and all responsibility upon each

such obligation and until the indemnitor shall serve upon the Surety competent, written, legal evidence of its final discharge from each such obligation and all liability by reason thereof.''

The contract for the erection of the Capitol building was, concurrently with the Contractor's bond, executed November 28, 1913. The former was very long containing, many things the Contractor was to do, not only with reference to the erection of the building complete in every respect and of its necessary equipment and accessories with materials of the very best quality in strict accord with the plans and specifications, but also with reference to the payment for all materials and of all subcontractors, laborers and other employees, the obtaining of releases therefrom, the correction of imperfections, etc., all of which were declared to be essential parts of the contract. The contract further provided that time was of the essence thereof and that the building should be completed by July 1, 1916, and if if not completed by that date the Contractor should pay the State $250 per day liquidated damages for the failure to complete the same within that time, but provision was made whereby in case of failure to complete, from any cause entirely beyond the control of the Contractor, the State Capitol Commission Board would grant an extension of time. The contract required that the Bond given by the Contractor should ''guarantee the faithful, prompt and efficient performance by the Contractor herein of all of the covenants, the agreements, undertakings, conditions and requirements of this contract on the part of the Contractor or of any sub-contractor's assignee of the contract, according to the strict terms of this contract, or according to any change or modification thereof or addition thereto. that may be made, as herein provided.''

The building was not completed by July 1, 1916. However, it seems that extensions were asked and granted, and the record shows that finally an extension was granted by the Board from May 15 to August 22, 1917.

On this last-named date, the Contractor asked the Board for a conditional acceptance of the building, such acceptance not to apply, however, to the completion of the main entrance, the elimination of certain stains on the walls, the restoration of their surface to a proper finish, the finishing and erection of seventeen self winding electric clocks and various other items of adjustment and repairs necessary to complete the work in accordance with the contract; and the conditional acceptance was also to be "without affecting in any manner the bond" given. The request for such conditional acceptance also stated that if it were given, the Contractor would then be in a position to obtain the certified releases required by the contract to be obtained from material men, subcontractors and laborers.

On September 8, 1917, the State Capitol Board, conditionally accepted said building with the exception of the things above specified and the replacing of certain cracked stones in the building with proper stones. The order of conditional acceptance recited that none of the provisions or requirements of the original contract, plans, specifications or bond, with reference to the exterior walls or any other part of said building, were waived, and that the conditional acceptance should not become effective until the consent in writing of the Contractor's Sureties had been obtained, nor until the Contractor should obtain and deliver the releases hereinabove mentioned. Both the Contractor and the Board expressly stipulated that the bond should remain and continue in force to guarantee the performance of those things which were required to be performed within one year from the date of the acceptance, to-wit, September 8, 1917. This conditional acceptance was agreed to by the defendant Surety Company on September 12, 1917. The Board, on the 28th of September, 1917, waived all claim upon the Contractor for the $250 a day specified as liquidated damages for failure to complete the building in the time specified by the contract. (The court permitted the defendant to show that this $250 a day feature

was waived by the Board but excluded that part of the Board's minutes containing a long statement of their reasons for releasing this feature of the contract).

Up to the time suit was brought no order of the Board was made discharging the Contractor's bond or relieving the Contractor or its sureties from any further liability upon the contract or bond. Consequently, there is no question but that the bond was in force throughout the year involving the commission for which suit is brought, namely, from November 28, 1916, to November 28, 1917.

The answer of defendant, among other things, set up that it "agreed to and did not charge or collect any premium or premiums on said bond for a longer period than three years" and that "no premiums on said bond for the year beginning November 28, 1916, or for any time subsequent to that date, have been charged, paid, or collected by or remitted to this defendant."

The evidence on both sides disclosed that defendant, at the solicitation of the contractor, relieved and excused the Contractor from further payments of premiums after November 28, 1916. The defendant was not compelled to forego such premiums but did so for reasons of its own and without consulting the broker or obtaining his consent thereto.

The case then, to restate it in a condensed form, is one wherein a broker has been employed to procure for defendant the contract or right to furnish the suretyship on a certain required bond, and the terms of the broker's employment are that he is to "be paid a commission of thirty-five per cent. on the *original* premium and all *renewal* premiums received by this company *as long as the bond remains in force*" and that too whether the broker's contemplated connection with the Company "continues throughout the life of the said bond or not." The broker, concededly, obtained the contract for the suretyship, said contract expressly binding the one seeking the bond to pay the original premium on the date of the execution thereof which would continue the bond in force for a

year, and 'to thereafter pay "a like sum annually in advance *until* the surety shall be discharged and re-reased from any and all responsibility . . . *and until the indemnitor shall serve upon the surety competent written legal evidence of its final discharge* from . . . such obligation and all liability by reason thereof." The bond was given and the premiums were paid up to the 28th of November, 1916, but, notwithstanding the fact that the bond was in force throughout the year succeeding said date and the principal in said bond was obligated under its contract to pay and was fully able to pay the premium for said year, the defendant Surety Company saw fit to forego said premium. The question is, what effect does this have upon the right of the broker, or of his assignee, to the stipulated commission under the broker's contract?

Defendant's position, when stated in its bare and plainest terms, is that as the broker's contract says he was to get thirty-five per cent. "on the original and all renewal premiums *received* by this Company," the contract should be regarded as rigidly limited to a strict and literal interpretation of the word "received." Under this interpretation if the Company did not *actually receive or collect* a premium the broker was not entitled to his per centage thereon, even though the fact that the premium was not received was due wholly to the voluntary renunciation thereof by the Company. It is not conceived that the contract should be interpreted to mean that the obligation to pay the broker's commission was to be left to the Company's voluntary choice or volition, nor is this view in anywise weakened by the further provisions that the broker was to be paid his commissions "as long as the bond remains in force" and he was to receive his commissions whether his contemplated connection with the Company continued "throughout the life of the said bond or not." Similar contracts in reference to broker's commissions have not been so interpreted. In Knisely v. Leathe, 178 S. W. 453, 455, the broker was employed to procure a contract of sale which he did, and his commissions

were to be paid him out of the purchase price and as the owner received it. The owner refused to comply with the contract or, in other words, he voluntarily chose not to receive the purchase money. It was held, not only that the broker was entitled to his commissions but that the court should have peremptorily instructed the jury to find for him. At page 459, Judge GRAVES, speaking for the Court *en banc* says that as "between the broker and his employer the latter could not refuse to enforce the contract which the broker's efforts had obtained and thereby defeat the broker's right to his compensation. And on page 461 Judge GRAVES says that the owner having accepted the contract secured for him by the broker "owed the duty to enforce that contract" to the end that the purchase price would be paid and the deferred payments of commissions would become due. The owner could not say. he would not enforce the contract the broker had obtained for him, and that therefore no commissions were due. It would seem that likewise in this case the employer in this case could not say to the broker, "You have done all you agreed to do, I have accepted the contract you obtained for me, but I will forego a part of the benefits thereof and as I have not *received* the benefits thus willingly foregone, you will have to also forego a part of your compensation."

In Currier v. Mutual Reserve, etc., Assn., 108 Fed. 737, the agent's contract was that no commissions under the contract should be payable to plaintiff "unless the payment from which the same is to be allowed [i. e. premiums] has been received in cash" by the defendant. It was held that since the agent had performed his services and obtained the contracts he was employed to secure, the defendant principal could not escape payment of the commissions by refusing to enforce the contracts it had. To the same effect are the following authorities: Goldsberry v. Thomas, 178 Mo. App. 334, 338; Knisely v. Leathe, 256 Mo. 341, 372 (first appeal); Webster v. Meyers, 52 Mo. App. 338, 341; Reed v. Union Central Ins. Co., 61 Pac. 21, 23; Ketcham v.

Axelson, 142 N. W. 62, 65; Groves v. Cook, 131 N. W. 854; Ely v. Wilde, 122 Pac. 1122; Pinkerton v. Hudson, 113 S. W. 35; Pedersen v. North Yakima, etc., Co., 116 Pac. 270; Alvord v. Cook, 54 N. E. 499; Ward v. Cobb, 148 Mass. 518.

The defendant sought to prove that a custom existed among surety companies whereby, in case the completion of a building is delayed through no fault of the contractor and no increased liability is incurred by the delay, no further annual premiums are charged during the additional time the bond is continued in force by reason of such delay. The alleged custom sought to be shown was not, primarily and directly, a custom among brokers and their principals whereby the former did not receive commissions on premiums voluntarily released for cause; but a custom on the part of Surety Companies in their dealings with contractors obtaining such companies as their surety, to waive the payment of premiums due for the time covered by delay in the completion of a building where the delay was without fault of the contractor and no increased liability was placed on the surety by reason of the delay. It will be observed, however, that the contract between the defendant Surety Company and the Contractor herein (which was the *object* for which the broker was employed and of the services which he rendered), was a straight, clear, out-and-out obligation on the part of the contractor to pay annual premiums so long as the bond remained in force. There was nothing therein providing for a release or adjustment of premiums due. Hence, in any suit based on such contract, no custom could be allowed to prevail over the explicit terms of the written agreement to pay. [Heffernan v. Neumond, 198 Mo. App. 667, 680; State ex rel. v. Public Service Comm., 269 Mo. 63, 75.] In other words, the defendant Surety Company could not have been compelled, by reason of any such alleged custom, to relieve the contractor from the payment of any premiums. Such a custom, even if pleaded and proven, would have proved unavailing to the contractor. Since the employment

of the broker had for its object the securing of a suretyship contract which allowed no room for the operation of a custom, the question might arise whether the broker's contract of employment could be affected by any such custom unless definite and explicit provision was made therefor in said broker's contract. There was neither in the contract of employment nor in the contract of suretyship any clause giving scope to a custom. However, defendant's position or theory no doubt is that the broker's contract of employment was entered into in the light of such a custom and hence the said contract must be interpreted in that light. In such case the object in showing a custom would seem to be, not for the purpose of explaining the technical meaning of any term used in the contract, but to show what the real agreement was in the minds of both of the parties to that contract, or, in other words, that the alleged custom entered into and became a part of the contract. But, in order to do that, custom would have to be pleaded. [Staroske v. Pulitzer Publishing Co., 235 Mo. 67, 76; Sherwood v. Home Savings Bank, 131 Ia. 528, 532; Mendenhall v. Sherman, 193 Mo. App. 684, 687.] This was not done. The court, however, did not refuse to allow the claimed custom to be shown but excluded the proffer testimony because it did not tend to establish any such custom. And clearly it did not. On the contrary, it showed there was no such custom in the legal sense of that term. Before a course of procedure can be said to have arisen to the dignity of a custom so as to enter into and form a part of a contract, it must be shown to possess "those elements of certainty, generality fixedness and uniformity which are essential to constitute such a custom." [Staroske v. Pulitzer Pub. Co., 235 Mo. 67, 75.] None of these were shown. On the contrary, all that was shown was that, oftentimes or "sometimes" the Surety Company would investigate the facts of a case and, if it was deemed by the company a case where a waiver or excusal of the payment of commissions should be made, they would do it; but whatever was

done depended upon the facts of that particular case and of what the company chose to do and not because of the operation of any certain and uniform rule or course of procedure. One witness said he could not say there was such a custom but that it had been done in many cases. Another witness said there was such a custom, but this was clearly only his conclusion, while his whole testimony shows that it was not a "custom" as that term is used in legal parlance. A "loose and variable practice" does not rise to the dignity of a custom so as to control the rights of the parties to a contract nor is a custom constituted by an alleged usage which leaves some material element to the discretion of the individual. [29 Am. & Eng. Ency. of Law (2 Ed.), 391.]

It is argued that both the contractor's contract to build the Capitol and the bond show that it was not contemplated that the bond would be in effect for a longer period than two-and-one-half years, and that whether the custom claimed was shown to be a *custom* in the legal sense or not, it should have been admitted as bearing upon what the broker and defendant meant when they made their contract. But the building contract, the contract for suretyship and the bond itself all showed, and it was clearly in contemplation, that the bond might well continue in force much longer than that, and the contract with the broker also shows that such possibility was clearly in view. Consequently, anything short of a custom in the legal sense cannot be relied upon to enter into and form a part of the written contract between the broker and the defendant. If said contract was dealing with the broker's right to commissions on premiums which, under certain circumstances, might or might not be charged and collected by the Surety Company according as it saw fit, then, in order to escape the payment of the commission on premiums thus foregone, the Surety Company should have inserted a provision to that effect. [Heffernan v. Neumond, supra.] Instead of that the defendant contracts to pay a commission of thirty-five per cent. on

the original premium and all renewal premiums received by the Company as long as the bond remains in force, and that the broker is to receive commissions whether he continues with the Company throughout the life of the bond or not.

The contention that the agency contract young Porterfield made with defendant on December 4, 1913, superseded or merged the contract sued on, is wholly untenable. They were wholly separate and distinct, each dealt with different matters, and the agency contract in no way referred to the other contract which dealt solely with the obtaining of the State Capitol Bond. The two contracts show on their face that they are separate, and the conceded conduct of the parties show they intended them to be separate. The broker's contract says he was to receive commissions throughout the life of the bond regardless of whether he was in the company's employ or not, the agency contract says the termination of his agency terminates his interest in commissions. The plaintiff's assignor ceased to act as agent under the agency contract in *February, 1914,* and yet the Company continued to pay the commissions due under the broker's contract concerning the State Capitol Bond during 1914, 1915 and 1916 to November 28th of that year. "Before one contract is merged in another the last must be between the same parties as the first, must embrace the same subject-matter and must have been so intended by the parties." [13 Corpus Juris., 598; Maddins Admrs. v. Edmundson, 10 Mo. 643, 647.] The parties to the contract have, by their course of conduct, disclosed their own construction thereof, and this should be followed. [Knisely v. Leathe, supra, l. c. 458; Miller v. Pepperling, 185 Mo. App. 222, 228; St. Joseph Union Depot Company v. Chicago, etc., R. Co., 131 Mo. 291, 305.] Besides, the broker's contract was fully consummated before the agency contract was made. The former was, therefore, not merged into the latter. [England v. Houser, 163 Mo. App. 1, 8.]

It is complained that the court committed error in the admission of certain testimony, to-wit: Evidence that Zimmerman, the resident vice-president and general manager of the defendant in the district covering the Surety Bond in question, said that the Contractor, John Gill & Sons Company, was seeking to be relieved of the payment of further premiums on the promise of giving the defendant future business in the way of furnishing the contractor other surety bonds; and that the defendant, Surety Company, when requested to waive the payment of further premiums, said they could probably waive their rights in the matter but could not waive the broker's rights and, therefore, would have to take an indemnity bond from the contractor to protect it against the payment of the broker's commission. It is difficult to see why the evidence of what Zimmerman said to Judge Porterfield concerning the "future business" matter and the waiver of further premiums on that ground, should be regarded as reversible error. Zimmerman was vice-president of the defendant company; he succeeded the man who made the contract with the broker; and he paid Judge Porterfield, as his son's assignee, the commissions that were paid after the assignment. Judge Porterfield was interviewing and demanding of this officer payment of the last year's commission. As this officer was entrusted with the management of the business concerning this bond, what he knew of it was not from hearsay nor were his admissions or declarations relative to the business incompetent or inadmissible. [Wharton on Ev. (3 Ed.), sec. 1177; Phillips v. St. Louis & San Francisco R. Co., 211 Mo. 419; Maleck v. Tower Grove, etc., Co., 57 Mo. 17, 21; Nickell v. Phoenix Ins. Co., 144 Mo. 426, 431.] The answer admitted the defendant "agreed to and did not charge or collect" the premium in question and then attempted to justify such course, and the evidence admitted went to show why it agreed to not charge them. As to the evidence relating to the taking of indemnity against the payment of the broker's commission if the premium was waived, it

should be said that the same evidence came into the case as a part of the cross examination of the president of the John Gill and Sons Company and was legitimately admitted there as throwing light on the interest he had in the matter to which he testified. Since the evidence properly got into the case, we think it would be treating the litigation as a mere game of technical skill to reverse the case because the same evidence also came in through a witness to whom the above rule of interest did not apply.

But, without regard to all this and even if the admission of the evidence complained of was technically erroneous, we are of the opinion that it should not affect the case or cause a reversal of the judgment. This for the reasons following: The suit is upon an admitted written contract, and performance thereof by the broker on his part is conceded. It is also beyond question that the bond was in force during the time sued for; that the suretyship contract which was the *object of the broker's employment* obligated the building contractor to pay premiums as long as the bond was in force; and the broker's contract provided that the broker was to be paid commissions "as long as the bond remains in force" no matter whether the contemplated connection of the broker "continues throughout the life of the said bond or not." It is, furthermore, beyond question that while the defendant did not "receive" the premium on which the commission sued for is based, yet the only reason was because the defendant made no charge against the Contractor therefor and did not see fit to enforce the contract which the broker's services obtained for it. There was, therefore, an absolute failure to make out any of the pleaded defenses to the contract sued on. Hence, the plaintiff was entitled to a directed verdict. [Knisely v. Leathe, supra, l. c. 461.] This being so, the question of error in the admission of the testimony above considered is not material, since the plaintiff was not helped by it nor was the defendant harmed.

Likewise, we do not think that reversible error was committed in the closing remarks of plaintiff's counsel to which a general objection was made that the argument was "improper."

The judgment is affirmed. All concur.