STEWART–DECATUR SECURITY
SYSTEMS, INC., Appellant,

v.

VON WEISE GEAR COMPANY,
Appellee.

No. 74–1419.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 11, 1974.

Decided June 5, 1975.

David Wells, St. Louis, Mo., for appellant.

J. William Newbold, Clayton, Mo., for appellee.

Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and WEBSTER, Circuit Judge.

WEBSTER, Circuit Judge.

In this appeal we consider whether, in a contract for the sale of goods, an approved prototype may displace an inconsistent specification in a written purchase order.

Appellant Stewart-Decatur Security Systems, Inc., manufactures jail doors for use in penal institutions. A small electric gear motor is employed to open and close the doors automatically. Appellee von Weise Gear Co. builds gears and fractional horsepower gear motors.

In early 1970, Stewart-Decatur placed an order with von Weise for a prototype of a gear motor to replace a gear motor then being supplied by General Electric Company. Von Weise had earlier submitted a drawing of such a prototype through its agent S. William Pratt, Inc. The design and dimensions set forth in the drawing had been approved by Gerald L. Butt, assistant to the engineering manager at Stewart-Decatur. The prototype was constructed and shipped to Stewart-Decatur for testing. It was installed in an actual jail door and tested over a period of three days by using it to open and close the door approximately three thousand times. At various times during this testing, slats were placed in the door frame to see if the gear motor would back off of a jam. Stewart-Decatur was satisfied with the performance of the prototype; at that time it did not know that the input speed of the prototype was 3200 r. p. m.[1]

Stewart-Decatur submitted a written purchase order to von Weise for 1560 gear motors on April 3, 1970. The purchase order referred to certain specifications of the General Electric motor, including an input speed of approximately 1590 r. p. m. It also included a previously agreed upon metallurgical change. The gear motors were to be manufactured "as per prototype drawing."[2] The drawing made no reference to input speed and this specification was overlooked at von Weise's place of manufacture.

Von Weise returned an order acknowledgment dated April 27, 1970, which referred to the accepted prototype by description and number,[3] and approved the sale of 1560 production line models of the prototype. Shortly thereafter, von Weise sent Stewart-Decatur a dimensional drawing of the prototype containing specifications identical to those in its order acknowledgment. Gerald L. Butt examined the drawing for Stewart-Decatur. He questioned two of the dimensions on the drawing not relevant to the problems which gave rise to this lawsuit, but nevertheless marked the drawing "approved for fabrication delivery urgent."

The first shipment of the production model gear motors was received by Stewart-Decatur on October 9, 1970. It was noticed from the specifications

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

1. Butt testified that his concern at that time was whether the motor would pass the test; he did not rely upon von Weise to produce a motor which would meet stated field requirements, but rather relied on himself and his own tests.

2. The purchase order read, in part:

   Gear motor[s], G.E. series 49 permanent split capacitor * * * approximately 1590/64 r. p. m.—115 V., 1 phase, 60 cycle, instantly reversible, shaft extension 2¹⁵/₁₆" from center line of gear box as per prototype drawing and with flat on shaft. Torque approximately 17 in. lbs. at 64 r. p. m., motor to have thermal overload and steel cupped output gear.

3. Von Weise's order acknowledgment confirmed the sale of:

   [No.] 1514 * * * Gearmotor[s], 64 r. p. m. ¹/₂₀ h. p. PSC motor w/auto. T.O., steel output gear, R.H. shaft ext., 115/60.

   Stewart-Decatur knew that "No. 1514" referred to the prototype it had tested and approved.

stamped on the motors that their input speed was approximately 3200 r. p. m. rather than 1590 r. p. m. as had been specified in the purchase order. After further testing, Stewart-Decatur found that the higher input speed prevented the motors from backing off a jam, making them unfit for use in jail doors;[4] it so notified von Weise. Much later tests revealed that the gear motors also failed to meet Stewart-Decatur's torque specifications.

Von Weise submitted a second prototype. When it, too, was found unsuitable, because it lacked self-locking capabilities, von Weise indicated that it would be unable to produce a unit acceptable to Stewart-Decatur.

At the time Stewart-Decatur placed its order with von Weise, it had a contract to install jail doors in a New York City prison and intended to use the von Weise gear motors in this project. When the motors were found unsuitable, and before the second prototype had been supplied, Stewart-Decatur purchased satisfactory motors from another manufacturer at an increased cost. Stewart-Decatur brought this action to recover the monies it had paid von Weise under the contract and the extra cost it had incurred when it purchased substitute motors. In a counterclaim, von Weise sought recovery of the production costs of the gear motors.

The District Court[5] applied the Uniform Commercial Code, as adopted in Missouri, and ruled that while technical specifications in a contract normally take precedence over an inconsistent model, Stewart-Decatur's actions with respect to the first prototype were a substantial

contributing factor in von Weise's failure to meet the motor speed requirement set forth in Stewart-Decatur's purchase order. It found that the variance in torque was not a basis for rejection of the production units because the variance was not discovered until after the rejection. It held that Stewart-Decatur had not given von Weise an adequate opportunity to correct the defect before "covering"[6] and that it was therefore not entitled to recover. Von Weise's counterclaim was also denied.

Stewart-Decatur appeals from the decision of the District Court, contending that: (1) von Weise was obliged to follow the technical specifications contained in Stewart-Decatur's purchase order, (2) Stewart-Decatur's failure to state the improper torque as a ground for rejecting the gear motors does not preclude it from relying on this to establish a breach of contract, and (3) Stewart-Decatur was entitled to cover following von Weise's alleged failure to tender gear motors which conformed to the parties' contract. Upon a full review of the record, we affirm the District Court, but we base our decisions on somewhat different grounds.

I.

The District Court was correct in applying the Missouri Uniform Commercial Code in this diversity action.[7] (V.A. M.S. §§ 400.1–101 to .10–102 (1965)) [hereinafter cited as § ——-——]. See, e. g., Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This case involves a transaction in goods;[8] we therefore begin our analysis with Article 2 of the Code.

---

4. A jail door must back off a jam to prevent a prisoner from blocking the door's closing with a hard object. Stewart-Decatur subsequently found, in testing the production line models, that it had not tested the prototype thoroughly enough, for when a hard object was placed at the top of a jail door, the motor would not back off. The original tests had only tested its ability to back off a jam in the middle of the door.

5. The Honorable James H. Meredith, Chief Judge, United States District Court for the Eastern District of Missouri.

6. See V.A.M.S. § 400.2–712(1). [Missouri Uniform Commercial Code hereinafter cited as § ——-——.]

7. Stewart-Decatur is a Delaware corporation; von Weise is a Missouri corporation; the amount in controversy exceeds $10,000. Federal jurisdiction is proper by virtue of 28 U.S.C. § 1332.

8. "Goods," as defined in § 2–105, includes "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than

■ Stewart-Decatur's purchase order was an offer. *Smyth Worldwide Movers v. Little Rock Packing Co.,* 235 Ark. 679, 361 S.W.2d 534 (1962); *see V'Soske v. Barwick,* 404 F.2d 495 (2d Cir. 1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); § 2–206(1)(b). Under pre-Code law, von Weise's written acknowledgment of this purchase order would have constituted a counteroffer, to be accepted or rejected at Stewart-Decatur's pleasure, since the acknowledgment did not agree to sell exactly what Stewart-Decatur offered to buy. *See* J. Calamari and J. Perillo, The Law of Contracts § 32 (1970). However, the Code has discarded the "mirror image" rule of acceptance and substituted §§ 2–204 to 2–207. Section 2–207(1) provides:

> A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

Thus, notwithstanding its facial irreconcilability with the purchase order, von Weise's acknowledgment operated as an acceptance within the meaning of this provision. *See generally* Davenport, *How to Handle Sales of Goods: The Problem of Conflicting Purchase Orders and Acceptances and New Concepts in Contracts Law,* 19 Bus.Law. 75 (1963).

A contract was created between the parties for the purchase and sale of gear motors. Our task here is to interpret that contract.[9]

## II.

■ Stewart-Decatur and von Weise agreed that a prototype gear motor would be produced and tested. "Prototype" is defined in Webster's Third New International Dictionary as "an original on which a thing is modeled * * * an individual that exhibits the *essential features* of a later individual or species * * *." (Emphasis added.) The circumstances under which the prototype gear motor was manufactured, tested and approved leave little doubt that the parties intended it to serve as the basis for any future dealings between them. Stewart-Decatur knew that von Weise was relying on the test results to establish the usefulness of the prototype and uncover any defects that would have to be remedied. One metallurgical change was, in fact, made. Stewart-Decatur knew that von Weise's order acknowledgment referred to production models of the prototype designation, yet it made no effort to object. Finally, the assistant to the engineering manager at Stewart-Decatur testified at trial that the company intended to order production line models of the prototype when it sent its purchase order to von Weise.[10]

As stated in Williston on Sales:

> 'If the defendant admits that he gave the same meaning to the words as did

the money in which the price is to be paid * * *."

9. A good deal of confusion has been created in this appeal by the parties' treating the case as if it involved a warranty claim. This is not a warranty case. In its complaint, Stewart-Decatur asked for damages on account of von Weise's breach of *contract.*

A warranty claim would arise under the Code only after the goods had been accepted. *See* § 2–714(2). Here the goods were rejected upon delivery.

While the case of *Union Pipe & Mach., Ltd. v. Luria Steel & Trading Corp.,* 225 F.2d 829 (6th Cir. 1955), cited by both parties to this appeal, held that a warranty created in a sale by sample could be sued upon without accept-

ance of the goods, that case was decided under the Uniform Sales Act, § 69 of which expressly permitted such actions.

10. Generally problems with regard to approved prototypes arise when the finished products fail to comport with the prototype. *See, e. g., Baltimore Mach. & Equip., Inc. v. Holtite Mfg. Co.,* 241 Md. 36, 215 A.2d 458 (1965). Our research has uncovered no cases with facts similar to those presented by this case, other than *Union Pipe & Mach., Ltd. v. Luria Steel & Trading Corp.,* 225 F.2d 829 (6th Cir. 1955), which dealt with the effect of an inspection on a warranty created under the Uniform Sales Act when a seller accepted a purchase order by signing it and returning it to the buyer.

the plaintiff, he should not escape liability by convincing the court that no reasonable man in his place would have given the words that meaning and that no reasonable man in the other party's place would have expected him to do so.'

1 A. Squillante & J. Fonseca, Williston on Sales § 10–2 (4th ed.1973), *quoting Wisconsin Marine and Fire Insurance Co. Bank v. Wilkin,* 95 Wis. 111, 69 N.W. 354 (1896); *see St. Joseph Union Depot Co. v. Chicago, R. I. & Pac. Ry.,* 131 Mo. 291, 31 S.W.908 (1895) (court will adopt parties' construction of contract); *Smith v. Crane,* 169 Mo.App. 695, 154 S.W. 857 (1913); *Coleman v. Ford Motor Co.,* 195 Mo.App. 554, 193 S.W. 866 (1917); *Porterfield v. American Surety Co.,* 201 Mo. App. 8, 210 S.W. 119 (1919). *See also Brevard v. Reichert Lumber Co.,* 287 S.W. 881 (Mo.App.1926) (purchase order ambiguity resolved in favor of seller).[11] Under § 1–103, principles of law and equity are to supplement the Code.

■ Our review of the record convinces us that the parties agreed to purchase and sell production line models of a previously approved prototype. Von Weise had performed in accordance with this agreement when its first shipment was rejected.[12]

■ This conclusion disposes of appellant's second contention that the variance in torque from the specifications was a breach of the contract. The District Court found that the torque specifications were not a factor in any of the exchanges at issue in this case and are of no probative value to the case. In view of our holding that the parties intended to be governed by the approved prototype, we cannot say that this finding was clearly erroneous. *See* Fed.R. Civ.P. 52(a).

Von Weise has not appealed from the District Court's denial of its counterclaim and our decision, therefore, does not affect that ruling. *See* C. Wright, Handbook of the Law of Federal Courts § 104 at 468 (2d ed. 1970).

Because we find there was substantial performance by von Weise according to the terms of the agreement at the time the units were rejected by Stewart-Decatur, we need not reach the issue of "cover" raised by appellant.

Affirmed.

---

**11.** The concept of construing a commercial transaction in accordance with the parties' intent pervades the Code. *E. g.,* §§ 1–201(11) ("contract" is the "total legal obligation which results from the parties' agreement"); 1–201(3) ("agreement" is the bargain of the parties in fact as found in their language or by implication from other circumstances); 1–205, comment 1 (meaning of agreement is to be determined by language and action of the parties); 2–208, comment 1 (parties' action is best indication of what their meaning was); 2–317, comments 2 & 3 (rules of construction of § 2–317 are designed to ascertain the intention of the parties). Of course, the Code is to "be liberally construed and applied to promote its underlying purposes and policies." § 1–102.

**12.** Appellant's reliance on § 2–317 of the Code is misplaced. That section, which deals with conflict of *warranties* (see note 10 *supra*), does provide that "[e]xact or technical specifications displace an inconsistent sample or model," but the drafters of the Code take great pains to note that the rules of § 2–317

* * * are designed to aid in determining the intention of the parties * * *.

* * * These rules are not absolute but may be changed by evidence showing that the conditions which existed at the time of contracting make the construction called for by the section inconsistent or unreasonable. § 2–317, comments 2 and 3.

While § 2–317 has not been the subject of extensive judicial interpretation, we think that even if it were applicable to the instant case, a strict application of its rules of construction would be unreasonable under the facts presented.