**FALCON TANKERS, INC., a Delaware Corporation, Plaintiff,**

v.

**LITTON SYSTEMS, INC., a Delaware Corporation, Defendant and Third-Party Plaintiff,**

v.

**WORTHINGTON CORPORATION, a Delaware Corporation, Third-Party Defendant and Fourth-Party Plaintiff,**

v.

**UNIROYAL, INC., Fourth-Party Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted March 8, 1976.

Decided March 29, 1976.

---

James M. Tunnell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, for Falcon Tankers, Inc.

Richard E. Poole, of Potter, Anderson & Corroon, Wilmington, for Litton Systems, Inc.

William Prickett, Jr., of Prickett, Ward, Burt & Sanders, Wilmington, for Worthington Corp.

Howard L. Williams, and Morris Lewis Stoltz, II, of Morris, James, Hitchens & Williams, Wilmington, for Uniroyal, Inc.

CHRISTIE, Judge.

In November of 1967, Falcon Tankers, Inc. entered into a contract with Litton Systems, Inc. for the construction of four oil tankers. Litton thereafter contracted with Worthington Corporation to manufac-

ture deepwell, self-priming, variable speed cargo pumps to be used to load and unload liquid jet fuel. One of the integral parts of the pumps is a flexible expansion joint designed to compensate for the ship's movements upon the water.

In February of 1968, Worthington approached Uniroyal, Inc.'s Mechanical Products Division in Denver respecting the purchase of allneoprene expansion joints for the twenty-four pumps. Negotiations ensued and, on August 5, 1968, Uniroyal sent a price quotation to Worthington's Denver office. This document was a printed form entitled "QUOTATION" and addressed to Worthington. Also typed on the form under the appropriate columns for "QUANTITY," "DESCRIPTION" and "PRICE" were details for Uniroyal Expansion joints specifying, inter alia, "Special Buna-N Construction for handling J.P.-4 and J.P.-5." [1] Also typed in were payment terms and shipping terms.

Printed below the address of Worthington and above the specifics of the quotation was the following:

"Gentlemen:

We take pleasure in quoting you on the material described below. All quotations, orders, sales and deliveries as to this or any other merchandise are subject to the conditions on the reverse side hereof."

On the reverse side, the following heading appears:

"CONDITIONS of SALE

Buyer, by ordering any of the merchandise specified on the reverse side hereof, agrees to the following conditions of sale:"

Nine paragraphs follow including language expressly limiting buyers remedies to a refund of the purchase price or replacement. The same paragraph specifically excludes any liability of the seller for consequential damages. The last paragraph reads:

"9. These conditions of sale supersede all prior or contemporaneous oral or written understandings, agreements or recommendations and may not be added to, modified, rescinded, or waived, in whole or in part, except by a writing signed by an authorized representative of Seller, notwithstanding any language that may be contained in any form of Buyer and notwithstanding any delivery of goods by Seller."

On October 25, Worthington sent a purchase order to Uniroyal. This was also a printed form addressed to Uniroyal at its Denver office. Typed in were substantially similar specifications for the expansion joints. Printed on the face of the "PURCHASE ORDER" under the date in the upper right corner is the following:

"IMPORTANT:—This contract and all invoices for payment of same are subject to conditions printed on the reverse side . . . "

Printed also on the front of the purchase order under the column denominated "DESCRIPTION OF MATERIAL:"

"RETURN ACKNOWLEDGMENT COPY ONLY IF EXCEPTION IS TAKEN TO ANY CONDITIONS SPECIFIED ON THIS ORDER."

At the very bottom of the form just above the line "Signed ——— " is the sentence:

"RECEIPT OF THIS ORDER IS HEREBY ACKNOWLEDGED, AND IT IS ACCEPTED IN ACCORDANCE

1. Buna-N and paracril are terms which refer to synthetic material which are alternate construction materials for rubber or neoprene. These materials were discussed during nego-tiations and agreed upon as being superior for handling J.P. −4 and J.P. −5 which are varieties of jet fuel.

WITH THE TERMS SPECIFIED HEREIN."

The purchase order is signed "Joe Arnold /s/." On the reverse side of the Worthington purchase order, there are 30 paragraphs under the general heading "CONDITIONS." Of these conditions the following may be relevant:

"2. Modification of purchase order. This purchase order contains the complete, final and exclusive agreement between buyer and seller and no course of dealing or usage of trade or actual course of performance shall be relevant to explain or supplement any term used herein. No modification or recision of the terms and conditions hereof shall be binding upon buyer unless made in writing and signed by the buyer's authorized representative."

"4. Acceptance. Seller shall execute where indicated and return the acknowledgment copy of the purchase order to indicate acceptance of this purchase order subject to its terms and conditions. . . ."

"11. Warranties, Inspection.

"a) Seller expressly warrants that all goods and services covered by this purchase order will conform to the drawings, specifications, data or other description furnished or adopted by buyer, will be merchantable, will be free from defects in design, material or workmanship, and will be fit and sufficient for the purpose or use intended by buyer. Seller agrees that this warranty shall survive acceptance of the goods and services and will run to the buyer, its successors, assigns and customers and all users of its products. Said warranty shall be in addition to any warranties of additional scope given to buyer by seller. * * *

"e) Final inspection shall be made by buyer after delivery at destination unless expressly provided in this purchase order. Preliminary inspection may be made by buyer at the premises of the seller and seller agrees, without additional charge, to provide all reasonable facilities and assistance required for convenient testing and inspection by the buyer. The foregoing shall not relieve seller of its obligation to give full and adequate tests and inspection and to furnish goods which conform to the contractual requirements of this purchase order and are free from defects. Payment for any goods shall not be deemed an acceptance thereof.

"d) If goods or services furnished hereunder do not conform to the contractual requirements of this purchase order, the buyer shall have the right either to (i) reject and return the same at buyer's expense for full credit including transportation both ways, (ii) ——— ——— the replacement of ——— of goods or services at seller's expense including transportation both ways, (iii) accept the same and either satisfactorily correct at seller's expense or to use it in its present condition at an equitable reduction in the purchase price, which if already paid shall be refunded by the seller forthwith, or (iv) cancel this purchase order in whole or in part under paragraph ———. No goods returned as defective shall be replaced or corrected without buyer's formal replace of correct order."

As a result of negotiations between Worthington and Uniroyal after the date of Uniroyal's receipt of the purchase order and before its return, a representative of Uniroyal struck out the typed words of the description of the joint that read "neoprene" and wrote in by hand "Buna-N or our paracril."

On December 16, 1968, Uniroyal sent to Worthington a document entitled "ORDER ACKNOWLEDGMENT" which on its face included the following printed legend:

"WE ACKNOWLEDGE AND THANK YOU FOR YOUR ORDER. OUR ACCEPTANCE OF THE ORDER IS CONDITIONAL ON THE BUYER'S ACCEPTANCE OF THE CONDITIONS OF SALE PRINTED ON THE REVERSE SIDE HEREOF. IF BUYER DOES NOT ACCEPT THESE CONDITIONS OF SALE, HE SHALL NOTIFY SELLER IN WRITING WITHIN SEVEN (7) DAYS AFTER RECEIPT OF THIS ACKNOWLEDGEMENT."

On the reverse of the order acknowledgment were the identical lists of conditions of sale as existed on the reverse of the price quotation form. Worthington received the document but did not respond to it.

The joints were received by Worthington in April, 1969. Preparation for installation and installation of the joints was done by both Worthington and Uniroyal. The joints, as it later became apparent, were not constructed wholly of Buna-N, but instead were only part Buna-N and part neoprene.

In December of 1971, one of the ships that had been fitted with Worthington pumps, the Falcon Lady, was inspected during a scheduled warranty stop. It was discovered that one of the joints had deteriorated. Worthington, now aware that the joints had not been made of 100% Buna-N requested later in December of that year that Uniroyal replace all the joints with new all Buna-N joints. Uniroyal either refused or was unable to do so upon short notice and, instead, immediately shipped at no cost identical joints as the originals. Worthington accepted these part neoprene, part Buna-N joints, but made attempts in January of 1972 to find other sources for joints. Worthington eventually had to purchase substitute joints

from two other companies. Some joints manufactured by one of the other companies subsequently failed as well. Uniroyal has maintained that it would replace the composite joints only if Worthington would relieve it of liability.

In 1971, after suffering extensive losses due to long periods of "down time" on the four tankers, Falcon brought an action against Litton, the shipbuilder. Litton filed a third-party complaint against Worthington and, in 1974, Worthington joined Uniroyal, Inc. as a fourth-party defendant.

Uniroyal has moved for summary judgment arguing in general that its liability, as governed by the terms of the price quotation, is limited to the replacement of joints. Further, under the terms of the Uniroyal form, it is argued that even if there was a breach [2] of the contract, Worthington has not made a timely claim and also that Worthington would not be entitled to consequential damages for losses due to the failure of replacement joints obtained from Anchor Packing Co.

In opposition to Uniroyal's motion for summary judgment, Worthington argues that the conditions of sale on the reverse of its purchase order are controlling. Under those conditions, no time limit for filing a claim has been violated and no limitations as to liability are imposed.

The question before the Court is simply framed: What language and what documents form the controlling contractual terms between Worthington and Uniroyal? Both counsel have presented weighty analysis, but the core issue involves the interpretation of U.C.C. § 2–207 (C.R.S. 155–2–207).[3]

■ The earliest communication between the parties, which might be consid-

---

2. The issue in this motion for summary judgment is limited to the extent of liability of Uniroyal *assuming* there has been a breach. The actual existence of a breach is not considered at this time, but must await trial.

3. Both parties agree that Colorado law governs, however, since the key to this case is the interpretation of the U.C.C. and, in the absence of Colorado law on the applicable sections, I have relied heavily upon well-reasoned opinions of other jurisdictions.

ered as an offer sufficient to warrant a binding acceptance, is Uniroyal's price quotation document of August 5, 1968. The price quotation contained terms of quantity, description and price amply specific and complete to the extent that, had Worthington responded with a conventional "I accept", there would have been an enforceable contract consisting of the terms on that document. (See *Earl M. Jorgenson Co., Inc. v. Mark Construction, Inc.*, Hawaii Supr., 540 P.2d 978 (1975) and *Rochester Plumbing Supply Co. v. A. Burgart, Inc.*, 49 A.D.2d 78, 370 N.Y.S.2d 716 (1975)

■ Worthington's response, however, did not consist of such nonequivocal language. Instead, the reply was a formal purchase order that contained additional and inconsistent terms. Under the old common law mirror-image rule, an acceptance must agree to terms identical to the offer in order for the acceptance to result in a binding contract. The Uniform Commercial Code (adopted in Colorado in 1965) § 2–207 has significantly changed the conventional law of contract. That section provides, in effect, that a response agreeing to something less than identical terms may be treated as an acceptance in part and a counter-offer in part in many situations though not in all situations.

Since the price quotation constituted a valid offer, one must then look to the language of § 2–207 to determine how Worthington's purchase order should be treated:

"Sec. *2–207. Additional terms in acceptance or confirmation.*

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered, or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this [Act]."

■ The general purpose of § 2–207 is to establish guidelines for the finding of a contract in the routine exchange of divergent forms between buyers and sellers in a commercial setting.[4] The details of

4. Uniform Commercial Code—Draftman's Comments:
"1. This section is intended to deal with two typical situations. The one is the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed. The *other situation* is offer and acceptance, in which a wire or letter expressed and intended as an acceptance or the closing of an agreement adds further minor suggestions or proposals such as 'ship by Tuesday,' 'rush,' 'ship draft against bill of lading inspection allowed,' or the like. A frequent example of the second situation is the exchange of printed purchase order and acceptance (sometimes called 'acknowledgment') forms. Because the forms are oriented to the

the statute are concerned with balancing the desire of the parties to control their own terms against the general interest of establishing an enforceable contract where economic reality makes it obvious that the parties have intended one.[5] A major consideration of the section is the prevention of the imposition of harsh conditions upon one party merely as a result of his "accepting" a price quotation or a purchase order form. Thus, on the one hand, the Uniform Commercial Code favors the finding of a contract (a binding agreement of the buyer to pay and the seller to deliver) wherever possible, while, on the other hand, the Code is concerned with closely examining conflicting or unilateral terms offered and counter-offers before incorporating them into the contract.

The case of *Dorton v. Collins & Aikman Corporation*, 453 F.2d 1161 (6th Cir., 1972) provides an excelling working description of § 2–207:

"Subsection 2–207(1) therefore provides that '[a] definite and seasonable expression of acceptance or a written confirmation . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.' Thus, under Subsection (1), a contract is recognized notwithstanding the fact that an acceptance or confirmation contains terms additional to or different from those of the offer or prior agreement, provided that the offeree's intent to accept the offer is definitely expressed, *see*

Sections 2–204 and 2–206, and provided that the offeree's acceptance is not expressly conditioned on the offeror's assent to the additional or different terms. When a contract is recognized under Subsection (1), the additional terms are treated as 'proposals for addition to the contract' under Subsection (2), which contains special provisions under which such additional terms are deemed to have been accepted when the transaction is between merchants. Conversely, when no contract is recognized under Subsection 2–207(1)—either because no definite expression of acceptance exists or, more specifically, because the offeree's acceptance is expressly conditioned on the offeror's assent to the additional or different terms—the entire transaction aborts at this point. If, however, the subsequent conduct of the parties—particularly, performance by both parties under what they apparently believe to be a contract—recognizes the existence of a contract, under Subsection 2–207(3) such conduct by both parties is sufficient to establish a contract, notwithstanding the fact that no contract would have been recognized on the basis of their writings alone. Subsection 2–207(3) further provides how the terms of contracts recognized thereunder shall be determined."

■ The analysis must begin with section (1) since Worthington's purchase order appears to be a definite and seasonable expression of acceptance. The specifications in the purchase order are substantially identical to price quotation. The major differences in the documents are the war-

thinking of the respective drafting parties, the terms contained in them often do not correspond. Often the seller's form contains terms different from or additional *to those set forth in the buyer's form.* Nevertheless, the parties proceed with the transaction.
2. Under this Article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained in the confirmation or in the ac-

ceptance falls within subsection (2) and must be regarded as a proposal for an added term unless the acceptance is made conditional on the acceptance of the additional or different terms."

5. For a comprehensive analysis of § 2–207, see Duesenberg and King, *Sales and Bulk Transfers under the Uniform Commercial Code,* Vol. 3, p. 3–1, Matthew Bender, N. Y. (1975 Cumulative Supp.).

ranty clauses in dispute. Considering the language of § 2–207(1) up to the "unless" proviso and considering recent case law, I conclude that appropriate purchase orders may be treated as acceptances with counter-offers. See *Hohenberg v. Killebrew,* 505 F.2d 643 (5th Cir., 1974; rehearing denied, 507 F.2d 1280 1975); *Rochester Plumbing Supply, supra,* and *Earl M. Jorgenson, supra.*

█ However, the controlling language in this case is the last clause of § 2–207(1): "unless acceptance is expressly made conditional on assent to the additional or different terms." The effect of this language is that if such a condition is expressly made, no contract would come into existence *unless,* of course, the offeror expressly assents to the additional or different terms in the "offeree's" response form. In other words, the result of the offeree making his acceptance expressly conditional on the offeror's assent is the transformation of offeree's document into a traditional counter-offer. Although the drafters of the Code favor treating a dissimilar response as an acceptance with a counter-offer, the impact of the last clause of § 2–207(1) is the preservation of the right of an offeree to insist on his terms if he can convince the offeror to assent. (Compare *Air Products and Chemicals, Inc. v. Fairbanks Morse, Inc.,* 58 Wis.2d 193, 206 N. W.2d 414 (1973). It is also important to note that if the offeror does not specifically agree to the offeree's different or additional terms, a contract may still come into existence through some performance by the parties which attains the level delineated in § 2–207(3).

█ In the instant case, I need not reach the § 2–207(3) question. Uniroyal, upon receipt of Worthington's purchase order, which contained additional and different terms, specifically and expressly assented to those varied conditions by signing under the legend "Receipt of this order is hereby acknowledged, and it is accepted in accordance with the terms specified herein." This clause, in conjunction with the notice on the upper portion of the document: "IMPORTANT: THIS CONTRACT, AND ALL INVOICES FOR PAYMENT OF SAME ARE SUBJECT TO CONDITIONS PRINTED ON REVERSE SIDE" clearly meet the spirit and the language of the express assent clause in § 2–207(1). In contrast, nowhere in Uniroyal's price quotation (or its later order acknowledgment) does it *require* express assent. It is the requirement of the signature and the receipt of that signature that takes this case out of the general scheme of § 2–207.

I conclude from this analysis that, under circumstances here present: Worthington's purchase order was a counter-offer, Uniroyal's signature was a binding acceptance and the contract was totally encompassed within the purchase order form.

█ Uniroyal argues that it only returned the purchase order because the form included the printed statement requiring the return of the "acknowledgment copy" only if exceptions are taken to conditions specified on the order. Viewing the purchase order as a whole, noting in particular the sentence printed above the signature and also the phrase printed in the margin "ORDER ACKNOWLEDGEMENT—TO BE RETURNED TO WORTHINGTON," I interpret the aforementioned directive to request the return of one particular copy in the specified situation. Regardless of the meaning of this curious sentence, clearly there was no request or need for a signature if Uniroyal was only returning the purchase order because of a change.[6]

6. The change made by Uniroyal on the purchase order ("neoprene" to Buna-N) was agreed upon by the parties and is not a different or additional term in the contemplation of § 2–207.

In *Construction Aggregates Corp. v. Hewitt Robins, Inc.*, 404 F.2d 505 (7th Cir., 1968; rehearing denied 1969), the Court treated a specific notice by the seller that the buyer's purchase order would not be accepted until all the seller's conditions and agreements were accepted (including the seller's warranty) as a counter-offer. The buyer's silence in response thereto was treated as an acceptance of that counter-offer. In the present case, in place of the offeror's silence, we have Uniroyal's signature. See also *Stewart-Decatur Security Systems v. Von Weise Gear Co.*, 517 F.2d 1136 (8th Cir., 1975).

■■■ Having decided that the contract had been formed as of Uniroyal's acceptance by signature of the Worthington purchase order, I further rule, in accord with basic contract law, that the order acknowledgment sent by Uniroyal on December 16 including its apparent attempt to add conditions to the acceptance is irrelevant and extraneous. See also *Columbia Nitrogen Corp. v. Royster*, 451 F.2d 3 (4th Cir., 1971).

\* \* \*

Since the terms of the Worthington purchase order govern the contract, Uniroyal's notice requirement of 30 days (as to any defective material) is ineffective to bar recovery. This action by Worthington against Uniroyal has been brought within the applicable statute of limitations (see C.R.S. 155-2-725).

Uniroyal also claims that even assuming it has breached its contract with Worthington, it is not liable for losses incurred as a result of the failure of the Anchor Packing joints which Worthington purchased in its attempt to cover for the failure of the Uniroyal products. The issue is one of consequential damages under § 2-715(2):

"§ 2-715. *Buyer's incidental and consequential damages.*

\* \* \* \* \* \*

(2) Consequential damages resulting from the seller's breach include:

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) Injury to person or property proximately resulting from any breach of warranty."

■■■ By the great weight of authority, consequential damages are only granted where the breach is a proximate cause of the losses and the damages were reasonably foreseeable at the time of contracting.[7] It is also recognized by the weight of authority that the negligence of an intervening party is not foreseeable (see *E. B. Specialties Co., Inc. v. Phillips*, 86 N.M. 331, 523 P.2d 1357 (1974)). While it is clearly foreseeable that Worthington would need to replace defective parts by obtaining replacement joints, it was not foreseeable that the replacement joints would themselves be defective.

■■■ Uniroyal's motion for summary judgment is denied. The issue of damages

---

7. Uniform Commercial Code—Draftman's Comments:

"2. Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach. The 'tacit agreement' test for the recovery of consequential damages is rejected. Although the older rule at common law which made the seller liable for all consequential damages of which he had 'reason to know' in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise. Subparagraph (2) carries forward the provisions of the prior uniform statutory provision as to consequential damages resulting from breach of warranty, but modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise."

must go to the trier of fact. The amount of recovery of such damages, if any breach is found, is to be measured by the terms of the Worthington purchase order as therein modified. Consequential damages, however, may not be awarded for losses resulting from the failure of the Anchor Packing replacement expansion joints.

IT IS SO ORDERED.