**FALCON TANKERS, INC., a Delaware Corporation, Plaintiff,**

v.

**LITTON SYSTEMS, INC., a Delaware Corporation, Defendant and Third-Party Plaintiff,**

v.

**WORTHINGTON CORPORATION, a Delaware Corporation, Third-Party Defendant and Fourth-Party Plaintiff,**

v.

**UNIROYAL, INC., Fourth-Party Defendant.**

Superior Court of Delaware, New Castle County.

Submitted April 29, 1977.

Decided Nov. 14, 1977.

James M. Tunnell, Jr. and Thomas Reed Hunt, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiff, Falcon Tankers, Inc.

Richard F. Corroon, Richard E. Poole, Michael D. Goldman, James F. Burnett and Daniel F. Wolcott, Jr. of Potter, Anderson & Corroon, Wilmington and of counsel, N. F. Caldwell, Pascagoula, Miss., for defendant and third-party plaintiff, Litton Systems, Inc.

William Prickett of Prickett, Ward, Burt & Sanders, Wilmington, for third-party defendant and fourth-party plaintiff, Worthington Corporation.

Howard L. Williams and Morris Lewis Stoltz, II of Morris, James, Hitchens & Williams, Wilmington, for fourth-party defendant, Uniroyal, Inc.

CHRISTIE, Judge.

Falcon Tankers, Inc. ("Falcon") seeks recovery from Litton Systems, Inc. ("Litton") for consequential damages which it says were caused by Litton's negligence and Litton's breaches of warranty. Falcon seeks to hold Litton liable for losses incurred during periods when certain oil tankers were inoperative because of cargo pump and expansion joint failures.

Litton contracted to design, construct and sell to Falcon four steel single screw bulk oil tankers. The tankers, which were to be chartered by the Military Sealift Command (formerly the "Military Sea Transportation Service") were to be so designed and constructed so as to satisfy that agency's standards for tankers carrying aviation fuels.

The ballast and cargo discharge system of the first tanker, the "Falcon Lady," failed during its first voyage and again during its second voyage. As a result, Falcon brought a three count action against Litton on November 1, 1971.

Count I sought recovery based upon Litton's alleged breach of its implied warranties that the "Falcon Lady" was merchantable and fit for her intended purpose. Count II sought recovery based upon Litton's breach of an alleged express warranty that the "Falcon Lady," as designed and built, would be able to carry Grade "B" petroleum (aviation fuel) and would meet all Military Sealift Command ("MSC") requirements. Count III sought recovery based upon Litton's alleged negligence in failing to exercise reasonable care in the inspection and testing of the pumps after they were designed.

Litton denied liability and raised two affirmative defenses. In the first affirmative defense, it was asserted that Falcon agreed, pursuant to Article XIII of the Ship Construction Contract, to submit all disputes to arbitration. Litton has since withdrawn this defense. In the second affirmative defense, it was asserted that Falcon waived all rights to consequential damages under the wording of Article IX of the Ship Construction Contract, as amended.

Litton also filed a third party complaint containing four pertinent counts against Worthington Corporation ("Worthington") as third party defendant. Worthington had designed and manufactured the cargo pumps which failed. In Count I, Litton sought indemnification from Worthington for its liability to Falcon. In Count II, Litton alleged that Worthington breached its express and implied warranties that the pumps were merchantable and fit for their intended purposes and sought recovery from Worthington for the costs Litton experienced in making good its warranties on the "Falcon Lady." In Count III, it was alleged that Worthington breached its express and implied warranties with regard to the three other Falcon tankers, the "Falcon Duchess," the "Falcon Countess" and the "Falcon Princess," and recovery from Worthington was sought for the resulting costs.

In Count IV, it was alleged that Worthington breached its express and implied warranties as to another vessel, named "Marine Chemist," and Litton sought recovery for the resulting costs.

Worthington filed a motion to dismiss the original and the third party complaints. This motion was denied in a reported opinion. See *Falcon Tankers, Inc. v. Litton Systems, Inc.*, Del.Super., 300 A.2d 231 (1972). This Court there held that Worthington did not have standing to raise the Falcon-Litton arbitration agreement as a defense. This Court also held that certain limitations as to liability which were contained in the Falcon-Litton contract did not preclude Falcon from recovering consequential damages from Litton. The Court stated:

"Litton has thus effectively disclaimed tort liability only for damages from whatsoever cause or however originating which may have been 'caused by or alleged to have been caused by any such *defect in material and* workmanship' (Emphasis added). No disclaimer of tort liability can be said to exist as to damages caused by Litton's alleged negligence in failing to exercise reasonable care in the selection or design of the cargo pumps or in failing adequately to test or inspect the pumps . . . The contract is found not to preclude Falcon from recovering consequential damages if they are shown to be caused by design defects in the Falcon Lady's cargo pumps. Falcon may be able to prove that it is entitled to recover such consequential damages upon proving the alleged breach of an express or implied warranty or actional negligence by Litton in the inspection or testing of the cargo pumps."

The motion to dismiss those counts of Litton's third party complaint not related to the "Falcon Lady" was also denied.

After that decision was rendered, Worthington answered the complaint and denied Litton's allegations. Worthington also pled various affirmative defenses. These defenses alleged that the ship's design was inadequate to accommodate the pumps, that Falcon and Litton knew or should have known that the pumps could not perform as desired, that the damages allegedly sus-

tained were not caused by pump repairs and alterations, that Worthington did not violate its warranties, that Falcon and Litton were negligent or contributorily negligent, that Falcon accepted delivery of the "Falcon Lady" with knowledge of the pumps' capabilities and limitations, that the damages were caused by breakdowns of equipment other than the pumps and were due to delays for which Worthington was not responsible, that the purchase order did not entitle Litton to indemnification, that Litton's acceptance of the pumps constituted waiver, that Littons' negligence suspended Worthington's warranties, and that Worthington performed its part of the repair agreement with Litton.

Worthington also asserted a counterclaim against Litton for the costs incurred modifying the "Falcon Lady's" cargo pumps, and asserted corresponding defenses and counterclaims with respect to the "Marine Chemist." These counterclaims were later withdrawn and need not be considered here.

Falcon amended its original complaint on April 9, 1974, by adding two new counts. The first sought recovery based upon Litton's alleged breach of its express and implied warranties in that the ballast and cargo pumps' expansion joints " . . . were defective in design and, after a few months' operation, deteriorated to the point where they had to be replaced with expansion joints of a different design." It also sought recovery for the tankers' reduced carrying capacity allegedly caused by design modifications to the cargo pump systems. Falcon, in turn, has since dropped this claim.

The next count demanded recovery based upon Litton's alleged negligence in the selection or design of the expansion joints and cargo pumps, and alleged that Litton was negligent in the inspection and testing of such equipment.

Litton denied liability and asserted five affirmative defenses. In the first affirmative defense, Litton sought dismissal of the amended complaint based upon the ship construction contract's arbitration clause. In the second, Litton sought dismissal of the amended complaint based upon the ship construction contract's liability limitation provision. The third affirmative defense was a pleading based upon the statute of limitations, and the fourth was an allegation that Falcon had already settled, compromised and been satisfied for these claims. In the final affirmative defense, Litton asserted that Falcon was contributorily negligent.

Litton amended its third party complaint to demand indemnification from Worthington for any additional Falcon recovery. It demanded recovery based upon the alleged breach of Worthington's express and implied warranties for all four Falcon tankers and for the "Marine Chemist."

Worthington denied the allegations of the amended third party complaint and asserted as affirmative defenses the contract's waiver of consequential damages, the statute of limitations and the fact that Falcon had already settled, compromised and been satisfied for its expansion joint losses. In Worthington's fourth affirmative defense it was alleged that the expansion joints on the "Falcon Lady" and "Falcon Duchess" operated longer than the warranty required.

Worthington filed a fourth party complaint against the manufacturer of the expansion joints, Uniroyal, Inc., demanding indemnification from Uniroyal for any portion of Worthington's liability attributable to the expansion joints.

Uniroyal denied liability and asserted that the terms of the Order of Acknowledgment it issued limited Worthington's claim to the replacement materials or to a purchase price refund. Uniroyal subsequently amended its answer to add a statute of limitations defense.

Uniroyal moved for summary judgment. The motion was granted in part and denied in part. This Court decided that the issue of damages had to go to the trier of fact, but that Uniroyal could not be held liable to Worthington for any consequential damages resulting from the unforeseeable failure of replacement expansion joints manufactured by one of Uniroyal's competitors.

See *Falcon Tanker, Inc. v. Litton Systems, Inc.,* Del.Super., 355 A.2d 898 (1976).

This is the Court's opinion after many weeks of trial and extensive briefing as to the issues raised in these extensive pleadings. The opinion is divided into three segments. The first deals with Falcon's claims against Litton; the second with Litton's claims against Worthington; and the third considers Worthington's claims against Uniroyal. Issues raised by the pleadings or in the briefs and not specifically dealt with in this opinion are resolved so as to be consistent with the opinion.

## I

### Falcon's Claims Against Litton

In 1967, MSC solicited proposals for the charter of four oil tankers. Through a joint effort with Litton, Falcon submitted a proposal which was accepted by MSC.

With a view to developing a new more economical type of tanker Litton, which represented itself to be an expert in the design and construction of oil tankers, agreed to design, to construct and to take a very substantial part in the financing of the tankers for Falcon. Under the terms of the Preliminary Specifications, which were incorporated into the Ship Construction Contract, Litton obligated itself to design and manufacture a tank vessel capable of carrying Grade "B" petroleum that would be safe and efficient to operate, that would satisfy MSC's requirements and that would remove " . . . ballast water and cargo per industry acceptable limits . . ." The Preliminary Specifications also stated:

"Any item that is omitted in these specifications which is necessary to the proper functioning of the plant shall be considered as a part of specifications. The seller [Litton] shall be responsible for systems compatibility and proper functioning of machinery installed."

Falcon waived the right of detailed plan approval, but retained the right of inspection. Falcon's right of inspection did not, of course, eliminate Litton's obligation to satisfy the terms of the contract. Falcon has shown that in spite of its extensive knowledge and experience in the tanker business, it did in fact rely upon Litton's skill and judgment to design, construct and sell tankers suitable for their intended purpose.

The vessels were to be employed in the so-called clean tanker service. This meant that the petroleum products to be transported could not, under any circumstances, be exposed to water. The empty tanks had to be "bone dry" before any cargo was to be loaded. Litton knew this, and contracted with Worthington for the provision of ballast and cargo pumps capable of meeting the requirements of clean tanker service.

Worthington, unlike many of its competitors, offered steam turbine driven verticle variable speed self-priming deep well pumps with priming valves located either above the deck or below the deck. The above-deck configuration was superior to its below-deck counterpart in two major ways: the above-deck location of the valves offered superior upper bearing lubrication and in that location the valves were more accessible for adjustment or repair.

Conflicting evidence was presented as to which firm selected the below-deck priming valve configuration which was eventually used for the Falcon pumps and as to whether Litton personnel knew of the advantages of the above-deck location. It is clear, however, that Worthington represented to Litton that either configuration would satisfy the demands of the clean tanker service without requiring a separate system to strip the final vestiges of cargo or water out of the tanks. In view of this representation and the general relationship of the parties, I attach no crucial importance to a determination of what firm made the final selection.

In the absence of a separate stripping system, the Worthington pumps were required to continue to remove liquid after gross pump down and after the pump initially lost its prime. The pumps were required to reprime or recycle over and over again. Worthington represented in effect that the pumps would perform this func-

tion. Under Section III, entitled *Operating Instructions,* Worthington stated in the pump technical manual:

"This unit is designed so that it can recycle continuously for hours without doing damage to itself . . ."

The Court rejects Worthington's assertion that all concerned should have understood that some unspecified minimum flow of liquid through the pump was necessary to insure its safety during the repriming process.

Prior to delivery of the "Falcon Lady" neither Litton nor Worthington adequately tested the cargo pumps to determine their suitability for this particular application.

Litton was negligent in failing to adequately test the pumps and in failing to make sure that Worthington did so. From previous experience with the construction of another tanker called the "Marine Chemist," Litton knew that smaller Worthington pumps of a similar design had experienced bearing failures and critical speed problems.[1] Litton knew that Worthington had not tested any of the "Marine Chemist" pumps in their fully constructed configuration. There was no reason to believe that Worthington had done so with the Falcon pumps. Worthington apparently did not adhere to the position that testing of a pump in its fully constructed form was necessary, in spite of the fact that minor variations in a particular design can affect a pump's performance characteristics.

In spite of these warning signals and in spite of the concern expressed by some of its own personnel, Litton did not test the pumps prior to their installation. Instead, it relied upon Worthington's assurances that the Falcon pumps would perform as desired. This approach was pictured as being in sharp contrast to the approach taken by at least one other shipyard, Newport News. There, vendors' equipment and component parts, including deep well cargo pumps, were routinely tested to insure their ability to perform the required tasks.

Adequate testing of the pumps would have revealed error in the calibration of the pumps' tachometers, the existence of a critical speed within the pumps' required operating range and the insufficient lubrication of the upper bearings during cargo stripping and Butterworthing (hot salt water tank cleaning) when the priming valve was located below deck.

MSC and Falcon accepted delivery of the "Falcon Lady" with the reservation that a stripping and discharge system acceptable to MSC was to be installed within six months. This reservation was necessitated by the system's inability during cursory pre-delivery testing to discharge liquid down to the level of the suction bellmouths and below.

On the "Falcon Lady's" first voyage, three cargo pumps failed during Butterworthing. Inspection of the pumps revealed rags and other debris clogging at least one pump. However, the upper bearings in all three pumps had been damaged by over heating. The presence of the rags has since been discounted as a major cause of the pump failures. It should be pointed out, however, that Falcon warned Litton of the possible clogging of the pumps unless the tanks were cleaned before the vessel was put into service. As a precaution, Falcon suggested that strainers be installed until all debris was eliminated from the system to prevent the debris from choking the pump mechanism. Litton failed to act on this suggestion.

Litton's on-the-scene representative, Mr. Emerick Polgar, decided these initial failures were caused by the overheating of the bearings during repriming. Worthington experts, on the other hand, further analyzed the failures attributing them to a critical speed in the pumps' operating range and ineffective bearings in that they were made from materials unable to withstand the heat being generated during pump operation.

1. Critical speeds are vibratory frequencies which, if excessive, can cause equipment to weaken or fail.

All five cargo pumps failed during the second voyage of the "Falcon Lady." These failures occurred during Butterworthing, stripping and gross cargo removal. Both Litton and Worthington had observers present when the failures occurred and none suggested that Falcon's personnel had abused or misoperated the pumps. The corrective measures later taken tend to confirm that misoperation was not the cause of the pump failures.

After these pump failures, MSC asserted that no more than two barrels of cargo could be left in any tank for the discharge system to remove liquid "per industry acceptable limits." This standard was later upheld during arbitration between MSC, Falcon and Litton. Litton is still appealing this decision, but I find it to be a correct statement of the standard. The design and placement of the suction bellmouths was such that a pump down to the bottom of the bellmouth would have left 4.2 barrels of residual liquid in the center tanks and slightly less than two barrels in most of the wing tanks. Pump down to the level of the bellmouths was all Falcon, Litton and Worthington ever expected from the pumps. This level of pump down, which was not achieved during the "Falcon Lady's" maiden voyage, was not sufficient to satisfy the contract requirements without additional means of removing liquid from below the bellmouths. For this reason, it is clear that the design of the system was defective as were the pumps.

Several corrective measures were taken to enable the cargo handling system to satisfy the contract requirements. At great expense, the priming valves were relocated to a position above deck, thereby greatly improving upper bearing lubrication. The critical speed problem was eliminated by stiffening the pump shafts with additional bearings. This permitted the pumps to be run at slower speeds, thus, improving their ability to strip while cutting down the amount of repriming necessary to perform the stripping function. A separate stripping system was also installed in insure removal of ". . . ballast water and cargo per industry acceptable limits." The number of "limber" holes in the tanker's structural members was increased to allow a freer flow of liquid from the various sections of the tanks to the suction bellmouths. Enclosures were placed on the weather deck over the pump turbines to protect them from the sea water's corrosive effects. Strainers were installed over the pump suctions to prevent debris from clogging the pumps.

The last three corrections were not as significant as the relocation of the priming valve, the elimination of the critical speed areas and the addition of separate stripping systems in bringing the cargo handling system up to contract specifications. By the time the corrections were made, all parties desired to take reasonable steps to cover all possible contingencies.

Falcon and Litton's contract contained a choice of law clause whereby they agreed that the laws of the State of New York would govern. Under these laws, I find that Falcon has established that Litton breached its express and implied warranties.

■ In accordance with Uniform Commercial Code § 2–313, 62½, *McKinney's*, Litton, through the preliminary specifications, expressly warranted that the tankers would be designed and built to operate safely and efficiently. They were not. Litton expressly warranted that the tankers would satisfy all MSC requirements, that the piping arrangement would ". . . insure removal of ballast water and cargo per industry acceptable limits . . ." in approximately eight to ten hours and that Litton would provide any equipment necessary to accomplish these objectives even where such equipment was not specifically mentioned in the specifications. These warranties were breached when the "Falcon Lady," as originally designed and constructed, could not meet MSC's pump down requirements.

■ Litton breached its implied warranty of merchantability. Litton's business was the construction and sale of oil tankers and it held itself out as having special knowl-

edge and skill in that business. Pursuant to Uniform Commercial Code § 2–314, 62½, *McKinney's*, the tankers were not merchantable. They could not pass without objection in the trade under the contract description and they were not fit for their ordinary purpose.

■ The implied warranty of fitness for a particular purpose was breached. See Uniform Commercial Code § 2–315, 62½, *McKinney's*. Litton knew the particular purposes, including MSC's charter requirements, the tankers were to serve. Litton also knew, as evidenced by Falcon's waiver of detailed plan approval, that Falcon was relying on Litton's skill and judgment in furnishing tankers that were suitable.

■ Litton was negligent in failing to make sure that the Worthington pumps had been adequately tested. This failure was especially apparent because Litton had notice prior to the delivery of the "Falcon Lady" that similar Worthington pumps had experienced design defects and operational difficulties and because the defects were such that reasonable testing could have revealed them. Litton was a seller-manufacturer, and thus, cannot avoid liability for its negligence by shifting the blame directly to Worthington. Litton was more than a conduit between Falcon and Litton. It designed, constructed and sold the tankers to Falcon. It was not just a retail outlet. This Court follows the weight of authority by holding that a seller-manufacturer is responsible for testing and inspecting the component parts it incorporates into its product. Litton is liable for its failure to do so because, in this case, reasonable tests or inspections would have revealed the component's defects. Litton's liability attaches, notwithstanding the fact that the defect may have been caused by the negligence of the component's manufacturer. See the cases collected in 3 A.L.R.3d 1016, 1919.

Falcon also seeks consequential damages for the period of time the "Falcon Duchess" was inoperative because of the failure of its Uniroyal expansion joints and for the period of time the "Falcon Princess" was inoperative because of the failure of its Anchor expansion joints which replaced the Uniroyal expansion joints.[2]

Falcon is not attempting to recover for the down time of the "Falcon Lady" and the "Falcon Countess." When their expansion joints had to be replaced, they were undergoing other scheduled repairs. The defective expansion joints could be replaced while these other necessary repairs were taking place, and thus, no additional down time resulted.

■ This Court previously held that Falcon was entitled to only those consequential damages caused by defects in design and not those damages resulting from defects of material or workmanship. See *Falcon Tankers, Inc. v. Litton Systems, Inc.*, Del. Super., 300 A.2d 231 (1972). Applying this standard to the expansion joint failures, the Court now holds that Falcon may not recover for the down time of the "Falcon Duchess" but that it may recover for the down time of the "Falcon Princess."

The evidence shows that the Uniroyal expansion joints on the "Falcon Duchess" failed because they could not withstand immersion in the aviation fuels carried by the tanker. I find that welding burns on the joints, redrilled, unplugged or uncoated bolt holes or over compression due to incorrect dimensions played no significant role in the failure of the "Falcon Duchess'" expansion joints. I find that the tanker's cargo chemically attacked the neoprene portion of the joints causing the outer cover to swell and weaken so that delamination and failure occurred. The other factors, if they had any effect at all, did not play a significant part in the failures.

Neoprene was not suitable for the service intended. Uniroyal, although initially hesitant to do so, eventually agreed to supply Worthington with joints made entirely of Buna-N. Both Uniroyal and Worthington

---

**2.** The expansion joints were large rubber tubes connecting the cargo pumps and the suction cans. They were intended to make the pump assembly flexible enough to withstand the hull's twisting movement.

knew that Buna-N would withstand aviation fuels' hostile environment better than neoprene. For some unknown reason, Uniroyal supplied joints made with a neoprene outer cover and a Buna-N inner tube rather than supplying joints made entirely of Buna-N as the contract required.

The deliberate selection of an unsuitable material, in this instance neoprene, (which, although otherwise of proper quality, is incapable of withstanding the conditions of service) would have been a defect of design and not a defect of material or workmanship. *Lombard Corp. v. Quality Aluminum Products Co.*, 6th Cir., 261 F.2d 336 (1958). In this case, however, Buna-N, not neoprene, was the material called for in the design and specified in the contract, and Buna-N was suitable for the intended service even though it is subject to attack by light and ozone and does present problems of adhesion. In fact, at the time of the trial, the tankers were operating satisfactorily with expansion joints made entirely of Buna-N. Under the circumstances, the apparently inadvertent substitution of a neoprene outer cover for Buna-N was not a defect in design. See *Lombard Corp. v. Quality Aluminum Products Co., supra.*

As previously stated, Falcon is precluded from recovering consequential damages for this type of non-design defect. For this reason, Falcon's claim for the down time of the "Falcon Duchess" must be denied.

The Court need not consider Litton's assertion that the statute of limitations bars this particular claim for damages.

■ After the mass failure of the Uniroyal expansion joints, Worthington demanded that Uniroyal replace all the joints with joints constructed entirely from Buna-N. When Uniroyal refused to do this unless relieved from liability, Worthington obtained all Buna-N replacements from Anchor Packing Co. ("Anchor") and from Mercer Rubber Co. ("Mercer"). Some of these replacement joints also failed, and Falcon, as has been indicated previously, seeks recovery for the down time caused by the failure of the Anchor brand expansion joints on the "Falcon Princess."

The Anchor joints failed because they were unable to withstand the pressure and vacuum conditions to which they were exposed in the Falcon application. As was the case with Uniroyal brand expansion joints, other factors are found to have had little or no effect on the cause of these failures.

In spite of the parties' dispute, it makes no difference whether the inability to withstand pressure was due to Anchor's failure to provide the joints with a necessary reinforcing ring or whether it was due to Worthington's failure to sufficiently inform Anchor of the anticipated pressure conditions. In either case, the defect causing the failures was one of design. Falcon can, therefore, recover from Litton for its consequential damages.

■ I find that Litton's liability to Falcon comes to a total of $500,000. This is found to be the amount of adjusted revenues Falcon lost when the "Falcon Lady" and the "Falcon Princess" were inoperative because of the pump and the chargeable expansion joint failure. The Court chose the calculations based upon each tanker's individual experience rather than those averaging the combined experience of all four vessels. I am of the opinion that this is a more accurate measure of Falcon's damages since Falcon is entitled to no damages for the "Falcon Countess" and the "Falcon Duchess."

Falcon calculated the amount of revenue each tanker generated per day while transporting cargo during the year in which these periods of inoperation occurred. This daily figure was multiplied by the number of days the tankers were inoperative, giving a total amount of revenue lost. Subtracted from this total lost revenue figure was the amount of daily expenses saved because the tankers were not transporting cargo. Each tanker had daily expenses that were fixed and daily expenses that were variable. The fixed expenses accumulated whether the tanker was operating or not. The variable expenses included such items as crew wages and benefits, fuel, stores and supplies and vessel insurance. These variable expenses

could in some cases be decreased or eliminated entirely during the tanker's periods of inactivity.

Falcon used different denominators in calculating daily revenues and expenses. The days set aside for mandatory scheduled repair periods, known as Guarantee Surveys, were not counted in when figuring the average daily revenues since the tankers would of necessity have been idle and would not have been generating any revenue during these periods. These periods were counted in when figuring average daily expenses because the fixed expenses and some variable expenses would still have accrued even though the vessels were idle. I find this to be a correct general approach to the calculation of Falcon's lost revenues under the special circumstances here present.

In a sense, the income from the tankers' voyages were always a financial benefit to the owners. However, these benefits were not always sufficient to cover the amounts due on the construction loans and mortgage loan insurance premiums. Worthington argues that Falcon suffered no damages because the tankers were not operating at a net profit. Worthington also asserts that the tankers lost less money when they were under repair than when they were operating. This is not found to be correct. When the ships were inoperative, the tankers generated no revenue but all of the fixed expenses and some of the variable expenses continued. When they transported cargo, the revenues generated were sufficient to cover all of the variable expenses and most of the time the revenues were sufficient to pay all of the fixed expenses. It was always to Falcon's advantage to operate the tankers.

Litton argues that Falcon's damages were not in the contemplation of the parties, and thus, not reasonably foreseeable. Litton's intimate involvement with both the chartering of the vessels to MSC and the financing of the vessels belies this fact. There can be no doubt that Litton knew Falcon would lose revenues if the tankers were unable to transport cargo.

The losses incurred are found to have been foreseeable.

Litton and Worthington both claim that Falcon's calculations are inaccurate because they fail to include the early unfavorable voyages. Falcon did not consider those early voyages of the "Falcon Lady" where it was ". . . rendered totally inoperable for significant periods of time due to total breakdowns of the main cargo pumps." I find that these voyages were not representative. Falcon did not err in excluding them from its calculations.

Worthington asserts that Falcon is not entitled to damages because the "Falcon Lady's" down time was caused by MSC's demand that a separate stripping system be installed and because other repairs were made while the "Falcon Princess" was having its defective expansion joints replaced and those other repairs were not caused by the cargo pump failures.

I find that the "Falcon Lady" was taken out of service because of the cargo pump failures and not because a stripping system had to be installed. The stripping system, if it was to be added at all, did not have to be installed until the six month Guarantee Survey, a mandatory scheduled repair period. The failure of the cargo pumps with its attendant period of repair merely offered an opportunity for the early installation of the stripping system and made it unnecessary to wait for the guarantee survey.

The performance of these other repairs does not affect Falcon's claim for lost revenues based upon repairs necessitated by the cargo pump and expansion joint failures. Under corresponding circumstances, Judge McLaughlin observed in *Atlantic Refining Co. v. Matson Navigation Co.*, 3d Cir., 253 F.2d 777, 778 (1958):

"Appellee's ship had been rendered unseaworthy through the major fault of appellant. The bottom condition could not be remedied without drydocking . . While the ship was laid up for the tort repairs appellee had her seasonal checkup and other damage taken care of. There was no rush about these latter . . .

We see no reason for penalizing appellee because of the common sense practice it followed."

The tanker could not operate until the cargo pumps and expansion joints were repaired. The other repairs affected were not mandatory to keep the vessels operational. Under the circumstances, the Court will not penalize Falcon for extracting the most benefit from these unexpected periods of inoperation.

## II

### Litton's Claims Against Worthington

In addition to building oil tankers for Falcon, Litton also constructed the "Marine Chemist," a chemical tanker, for Marine Transport Line, Inc. This tanker was equipped with thirty Worthington electric-driven verticle turbine pumps, some of which were self-priming.

After the tanker was launched, several of the pumps failed during testing. It was decided that the graphite bearings were unable to withstand the conditions of service. They were replaced with teflon bearings. Also, the pump drive shafts were found to be too small. This created a damaging critical speed within the operating range which caused the pumps to vibrate excessively. When all thirty of the pumps were returned to Worthington for the bearing change, the shafts were replaced with larger 1¾ inch diameter drive shafts. The pumps have functioned properly since.

Litton's amended third party complaint asserted that the "Marine Chemist's" pumps were neither merchantable nor fit for the purposes for which they were built.

Worthington was engaged in the business of designing, manufacturing and selling pumps for tankers. It held itself out as having special knowledge and skill in this area and it knew the particular purpose which the "Marine Chemist's" pumps were to serve.

The warranty clause of the Litton-Worthington purchase order stated:

"WARRANTY—Notwithstanding any inspection (and failure to reject) or acceptance (prior to expiration of the warranty period) of the Contract Products by the Buyer, or the owner, if at any time after delivery of the Contract Products to Buyer and within six (6) months after delivery of the vessel on which the Contract Products are used, or such longer period of time set forth elsewhere in this Order any weakness, deficiency, failure, breaking down or deterioration in workmanship or material furnished by the Seller (herein called defective Contract Products) shall appear or be discovered or if it is found in any way not in accordance with this purchase Order, Buyer shall have the Option (1) to require Seller to promptly replace or correct the defective Contract Products in place and at no expense to Buyer or (2) to terminate this Order and to replace or correct the defective Contract Products by contract or otherwise and charge the Seller with the expense thereof. This warranty period shall be extended by an amount of time equal to any time during which any vessel is out of service by reason of a failure or deficiency in the Contract Products hereunder. Whenever practicable the Seller shall be given an opportunity to inspect the defective Contract Products before the defects are remedied. In the event of rejection by the Buyer or the Owner of the Contract Products, the Buyer, if time permits, may at its option, allow the Seller to furnish such technicians and perform such tests as necessary to repair or remedy the defects in the Contract Products, all at Seller's cost. Seller warrants that the Contract Products shall be new, the best suited of their respective kinds and manufactured or constructed in accordance with the plans, specifications, rules and regulations referred to in this Order. The Seller also warrants that the Contract Products shall be so manufactured or constructed as to operate satisfactorily as specified and shall be delivered on time as required by this Order. All costs incurred by Buyer caused by or in connection with correction of defective Contract Products shall be borne by the Seller."

The purchase order contained a choice of law clause which provided that the laws of the State of Mississippi should govern. The Court will adhere to the choice of law provisions.

Under Title 75, Mississippi Code, 1972, Worthington breached its express and implied warranties. Worthington warranted that the "Marine Chemist's" pumps ". . . shall be so manufactured or constructed as to operate satisfactorily as specified . . ." They repeatedly failed and did not perform satisfactorily.

As a merchant, Worthington was subject to an implied warranty of merchantability under § 2–314 of the Mississippi Uniform Commercial Code. To be merchantable under § 2–314(2)(c), the pumps had to be ". . . fit for the ordinary purposes for which such goods are used . . ." They were not. A critical speed existed within the pumps' operating range. This critical speed caused vibration damage to the pumps. They could not be run successfully until this critical speed was removed. In addition, the graphite bearing material was unsuitable and had to be replaced with teflon before the pumps operated satisfactorily.

Likewise, pursuant to § 2–315 of the Mississippi Uniform Commercial Code, the implied warranty of fitness for a particular purpose was breached. Worthington knew the particular purpose the pumps were to serve, and it knew Litton was relying on its skill and judgment to furnish suitable pumps. The pumps it supplied, with their critical speed and bearing problems, were not suitable for their intended purpose.

Worthington asserts several defenses to its liability. It claims in its answer to the original third party complaint, that Litton's failure to properly clean the "Marine Chemists'" tanks permitted foreign material to enter the pumps. This foreign material, particularly a granular abrasive known as "Black Beauty", supposedly contributed to the failures by clogging the pumps. I find that this defense lacks substantial factual support. The failure of some pumps located in surgically clean stainless steel tanks convinces me that the failures were not basically attributable to foreign material.

Worthington asserts that the pumps failed because Litton's improper installation caused them to be misaligned. I reject this defense with two observations: First, Worthington had a person on the scene who assisted or supervised pump installation. Second, Worthington's own personnel rejected misalignment as a contributing factor when failures continued to occur after the alignment was checked and corrected.

Worthington asserts that the improper bearing material selected by the ship's owner caused the "Marine Chemist" failures. The record, however, indicates that prior to the preparation of the technical specifications, Worthington's cost estimating proposal specified graphalloy bearing material. In any event, under the circumstances here present, Worthington cannot escape liability even if the eventual owner specified unsuitable bearing material. Worthington expressly warranted against ". . . any weakness, deficiency, failure, breaking down or deterioration in workmanship or material furnished by the Seller—[Worthington] . . ." Further, the technical specifications required Worthington to provide pump parts made from materials suitable for the intended service.

It is clear that the critical speed problem was the major cause of the "Marine Chemist" pump failures. The improper bearing material alone did not cause these failures.

Worthington's liability for its breaches of warranty with regard to the "Marine Chemist" pumps has been established. These breaches damaged Litton by requiring removal, reinstallation, retesting of the pumps and there were other related expenses. Initially, Litton estimated its damages at $134,614.00. Following extensive reevaluation and study, Litton revised this figure. Litton's updated, detailed estimate of damages is $99,570.00. Worthington countered by estimating Litton's damages at $85,000. The Court places Worthington's liability for the "Marine Chemist" pump failures at $95,000.00.

*　*　*　*　*　*

■ Litton claims that Worthington is liable for all damages it must pay to Falcon. Worthington argues that Litton is bound by an alleged representation that Worthington would not be held liable for the "Falcon Lady's" down time if the reworked cargo pumps were returned and reinstalled before a separate stripping system was installed and before the ship was ready to sail. Worthington says it cannot be held liable since the reworked and repaired pumps were, in fact, delivered and installed before the tanker was otherwise ready to embark. The Court disagrees.

Mr. John Serrie, the Litton employee who Worthington says extended the offer to Worthington, denied making it. He testified he told Worthington's personnel they could minimize their liability if they were able to rework and reinstall the pumps before the separate stripping system was installed. Mr. Serrie believed at that time that no liability would attach to Litton and Worthington for the down time necessitated by installation of the stripping system. Therefore, if the pumps were repaired while the "Falcon Lady" was out of service because of such installation, Worthington's and Litton's possible liability for down time caused by the pump failures could be minimized or eliminated.

Mr. Serrie's testimony disputes the contention that a commitment was made which relieved Worthington from any liability. So does an internal Worthington memorandum authored by Mr. H. W. Runyon, the man Mr. Serrie spoke to. The memo states:

> "He [Serrie] made the statement that if Worthington could get these pumps rebuilt and reinstalled in an operating condition before the modified stripping system was ready for operation within the vessel. That *in all probability* the liability for holding-up the ship would be removed from both the shipyard and Worthington. *This, of course, is an offhand statement with no legal back up . . .*" (Emphasis added)

Mr. Serrie's offhand observation is not found to be a legally binding commitment to hold Worthington blameless for the "Falcon Lady's" down time.

I find that Worthington breached its express and implied warranties. As with the "Marine Chemist," Worthington's dealings with Litton in regard to the Falcon Tankers were governed by the Mississippi Uniform Commercial Code. Worthington is, therefore, liable to Litton for the down time caused by the "Falcon Lady's" pump failures.

Worthington is also liable to Litton for the consequential damages sustained by Falcon as a result of the Anchor expansion joint failures on the "Falcon Princess." As has been explained, the Anchor joints failed because they could not withstand the pressure and vacuum conditions of the "Falcon Princess'" tanks. They were, therefore, in breach of Worthington's express warranty that they would operate satisfactorily and the implied warranties of merchantability and fitness for a particular purpose. Indeed, even if Mr. Serrie's statement had been a valid defense to Litton's other indemnification claims, it still would not have protected Worthington from liability for the expansion joint failures. The statement had nothing to do with the expansion joints, coming as it did well before they failed.

Litton's amended third party complaint alleged Worthington breached the express and implied warranties that the pumps and expansion joints on all four tankers in the Falcon series were merchantable and fit for their intended purposes. Litton seeks recovery for the costs resulting from these breaches.

The purchase order for the Falcon tankers contained the same warranty provision as the "Marine Chemist" purchase order did. As has been previously observed, Worthington was engaged in the business of designing, manufacturing and selling cargo and ballast pumps for use in oil tankers, it held itself out as having special knowledge in this area, it knew the particular purpose the pumps were to serve in the Falcon tankers and it knew that Litton was relying on it to provide pumps suitable for the Falcon application.

Worthington is, therefore, subject to the provisions of § 2–313 of the Mississippi Uniform Commercial Code, the express warranty provisions. It is subject to the implied warranty of merchantability created by § 2–314 and the implied warranty of fitness for a particular purpose created by § 2–315. These warranty provisions were violated.

A major cause of the "Falcon Lady's" pump failures was the overheating and eventual destruction of the upper bearings. The bearings overheated during recycling and repriming because they were not sufficiently lubricated. Worthington knew that aviation fuels, the expected cargo of the Falcon tankers, were poor lubricants. Worthington also knew that the above-deck placement of the priming valve assembly provided better lubrication qualities than did the below-deck configuration. The evidence is in conflict as to whether Worthington informed Litton of the lubrication advantages of the above-deck location. In any event, Worthington presented Litton with the option of having the priming valve installed either above or below deck, and warranted that the below-deck configuration was suitable for the contemplated service. Worthington went so far as to assure Litton, subsequent to the "Marine Chemist" failures, that this configuration would perform satisfactorily on the Falcon tankers.

Worthington represented, as did some of its competitors, that its pump could recycle (reprime) continuously for hours without sustaining damage. Messrs. Slaughter and Berman, the co-inventors of the pump, believed the pump could do so once initial prime was established. Additional fluid was unnecessary to protect the pump, or so they thought prior to the Falcon failures. Once the failures occurred, Worthington seemed to indicate that additional outside liquid was required for the pump to recycle safely. Not only is this position contrary to the one Worthington's personnel had prior to the failures, but it is also contrary to the operational theory of a self-priming pump. A self-priming pump purportedly does not depend upon outside liquid to re-establish prime or to lubricate the pump during the repriming process once initial prime has been established.

■ Once the pumps failed, Worthington recommended that the priming valve be relocated above deck to alleviate the lubrication problem. This, Worthington represented, would permit the pumps to safely recycle almost indefinitely once initial prime was established. Worthington cannot now be permitted to say that the priming valve relocation was unnecessary especially where the relocation was time consuming, costly and complicated. Litton had a right to rely on Worthington's recommendation since Worthington was the pump expert.

■ Worthington offers several defenses to its liability for the priming valve relocation. The Court finds them unpersuasive.

Worthington claims that Litton's employee, John A. Serrie, relieved it from liability by verbally stating that Litton would assume the cost of moving the priming valves if Litton had in fact chosen the original below-deck location. Without considering possible statute of frauds problems, the Court finds this defense is without merit. Mr. Serrie vehemently denied having made this statement. Rather, he asserted that he said if Litton had forced Worthington to put the priming valve below deck against Worthington's will, then Litton would in all probability be responsible for the cost of relocating it. Litton did not force Worthington to place the value below deck. The evidence shows that Litton initially contemplated an above-deck configuration and, in fact, did not consider a below-deck location until Worthington introduced it as an acceptable alternative. Worthington, in effect, agreed that all things being equal, it would prefer the below-deck location. Presumably, it would, under such circumstances, emphasize to its customer that the below-deck location was preferable. There was conflicting testimony as to whether Worthington's schematic drawing showing the possible priming valve locations should have been interpreted as indicating that the below-deck location was preferred.

The evidence favors Mr. Serrie's interpretation of his own remarks. I find that Worthington expressly and impliedly warranted the suitability of the below-deck priming valve. Worthington cannot avoid liability by relying on what I find to be a mistaken interpretation of Mr. Serrie's statement.

Worthington claims that the overall cargo handling system designed by Litton was inadequate. These alleged inadequacies, rather than the pumps themselves, Worthington asserts, caused the failures. While Litton's design for the cargo handling system was inadequate in some ways, evidence shows that pump defects, not system defects, were the predominate cause of the "Falcon Lady's" dismal performance.

The location of the suction bellmouths is not found to have significantly affected the tanker's pumping performance. Some of the bellmouths were not situated in spots suited to assure maximum efficient pump down. Litton explained that compromises had to be made because of the positioning of the tanker's internal structural members. In any event, even where the bellmouths were, according to Worthington, properly placed, the pumps failed.

Worthington says that there were not enough holes in the internal structural members of the tanker to allow a free flow of liquid to the pumps. After the pump failures, Litton in deference to Worthington's request, added more of these "limber holes." The evidence refutes Worthington's contention that inadequate limber holes were an important factor. Mr. Te Leng Wu, a Falcon engineer, made the only comprehensive analysis of the adequacy of the "Falcon Lady's" limber holes. Mr. Wu concluded, and the Court agrees, that the size and number of "limber holes" was essentially adequate prior to the pump failures.

Worthington contends that the "Falcon Lady's" piping system was overly long and complex. There is no evidence, however, that these defects significantly contributed to the pump failures. Even Mr. John Slaughter, one of the pump's inventors, stated that piping does not affect the operation of the priming system.

Worthington also asserts that rags and debris left in the tanks clogged the pumps causing them to overheat and fail. As with the "Marine Chemist," debris was found in some but not in all the pumps that failed on the "Falcon Lady." The repairs that were eventually made to the "Falcon Lady's" pumps would not, for the most part, have been necessary if rags had caused the failures. There is no convincing evidence that the rags and debris significantly contributed to the "Falcon Lady's" pump failures.

The Worthington pumps contained a critical speed, an excessive resonant frequency, within their operating range. Worthington's initial response to this discovery was to place a sign on the operating controls restricting the speeds at which the pumps could be operated. This was a direct violation of the Purchase Order's speed variability requirements. Pump speed could not be slowed as much as the contract required. The inability to slow the pumps increased the speed at which the liquid entered them. The increased speed of the liquid caused vortexing, a whirlpool effect, which permitted more air to enter the pumps. This, in turn, caused the pumps to recycle or reprime more often which exacerbated the upper bearing's dry operation problem and made the stripping results less satisfactory. Under these circumstances, Worthington cannot substantiate its claim that Falcon and Litton personnel abused the pumps by forcing them to recycle excessively.

The critical speed problem was further aggravated by improper tachometer calibration. The operator could not know the pump's true speed because the tachometer reading was in error.

I find that the critical speed problem contributed significantly to the pump failures. It aggravated the upper bearings lubrication difficulties, and this dry operation problem made the pumps more susceptible to the stress and metal fatigue failures critical speed vibration causes. Worthington's response, which included doubling the number of drive shaft bearings to eliminate the critical speed, clearly shows that this

was believed to be a major cause of the "Falcon Lady's" pump failures.

Under the terms of the Purchase Order, Worthington was required to supply equipment that was, ". . . suitable and adequate for the service intended . .," and was required to, ". . . insure that the sizes, heads and capacities of the pumps are compatible with the equipment provided and shall submit any necessary modifications for approval." The Purchase Order continued:

"Plans of equipment required to operate in conjunction with equipment supplied by others shall clearly indicate design standards, tolerances and all other necessary information required for engineering coordination of related items and parts."

Worthington, while not contractually obligated to design and warrant an entire cargo handling system, was required to insure that its pumps would survive and perform satisfactorily in the cargo handling environment designed by Litton. It did not do so. In fact, Worthington did not respond when Litton sent drawings to it for information, review and comments.

Worthington's own expert witness, Mr. Roy Lee Harrington of the Newport News Shipyard, testified that the pump vendor was responsible for informing the ship designer of any problems that would keep the pumps from functioning as desired. Despite the fact that Worthington claims it was not responsible for the overall design of the cargo handling system, it did have significant input in changing Litton's original design from thirty cargo pumps per tanker to the one eventually used which called for 5 cargo pumps per tanker.

Litton seeks to hold Worthington liable for the total expense of installing separate stripping systems in all four of the Falcon tankers. Worthington counters by asserting that Litton's faulty design of the cargo handling system made installation of the separate stripping systems necessary.

The evidence leaves little doubt that Litton's original design was faulty. Litton knew the tankers were to be clean service tankers. This required the cargo and ballast handling system to achieve a "bone dry" condition because the intended cargo, aviation fuel, could not be contaminated with other types of liquid. Litton's contract with Falcon required that this degree of pump down be accomplished within eight to ten hours.

Litton anticipated that Worthington's pumps would remove liquid to the level of the bellmouth. Litton contemplated three different ways of discharging the liquid remaining below the bellmouth. *First*, Litton anticipated using strip-dry connections attached to the main Worthington cargo pumps. Under this method, small hoses would be attached to the pumps and placed in the liquid, thus pumping out this residue. *Second*, Litton considered using small pumps known as "Red Devils" to remove the residual liquid. These "Red Devils" would have been lowered into the tanks from the vessel's deck. *Finally*, Litton considered having men with mops and buckets enter the tanks to sop up the remaining liquid.

The Court finds each of these methods of residual liquid removal to be inadequate, especially in light of the contract's limitation on pump out time. Even if the pumps had removed liquid to the level of the bellmouth, Litton was required, under the terms of its contract with Falcon, to devise a more suitable means of removing the remaining liquid than those it considered.

On the other hand, Worthington's pumps did not perform as warranted. Worthington represented that its vertical self-priming cargo pump eliminated the need for a separate stripping system. This was not the case, however. As discussed earlier, the priming valve lubrication problem and the critical speed problem hindered the pumps' ability to strip. As a result, the pumps on the "Falcon Lady" were unable to consistently and reliably pump down to the level of the bellmouth. The Court agrees with the arbitration decision that a means independent of the main cargo pumps was required to insure liquid removal to the level of the bellmouth and below.

Litton claims it reasonably relied on Worthington's representations to its detriment. The Court does not find that any such reliance entitles Litton to look to Worthington for the cost of a separate stripping system. Even had Worthington's pumps removed liquid to the level of the bellmouths, which was all any of the parties expected of them, a separate stripping system would still have been required to achieve the pump down necessary for tankers operating in the clean tanker service. The fact that these stripping systems had to be added to the vessels at a later time was a result of the inadequacy of Litton's original design and not of the failure of Worthington's pumps. As an experienced ship designer, Litton knew or should have known that separate stripping systems were necessary to achieve a "bone dry" condition in the Falcon application. Worthington bears no responsibility for Litton's failure to include an adequate means of residue removal in its original design.

Litton seeks damages from Worthington for the cost of replacing the failed expansion joints on all four tankers. The Court has already granted Litton's indemnification claim. Included in that claim was an amount for the "Falcon Princess'" down time caused by the failure of its Anchor expansion joints. Pursuant to Mississippi law, Worthington's use of Uniroyal brand neoprene and Buna-N expansion joints breached its express and implied warranties. Indeed, Worthington has not vigorously disputed its responsibility. This Court agrees and will adhere to that position.

The specifications required joints constructed entirely of Buna-N, but the joints originally provided contained a neoprene outer cover surrounding a Buna-N inner tube. Neoprene was not suitable for the intended service of the Falcon tankers because of its vulnerability to chemical attack when immersed by aviation fuel. The joints failed when cargo caused the outer cover to swell, weaken and delaminate. As stated earlier in this opinion, the Court is convinced that welding burns, improper bolt hole patterns, unplugged bolt holes and in-correct sizing contributed insignificantly, if at all, to the expansion joint failures.

Worthington's failure to provide all Buna-N expansion joints breached its contract and warranty obligations. Worthington was, in fact, instrumental in persuading Litton to change its original design from using an "O" ring arrangement to using rubber expansion joints. It is liable for Litton's costs in replacing the joints.

The verticle deep well self-priming cargo pumps with their inadequate upper bearing lubrication, their inability to remove cargo to the level of the bellmouth and with faulty expansion joints failed to comply with Worthington's express warranty that they would " . . . be so manufactured or constructed as to operate satisfactorily as specified . . . " in violation of § 2–313 of the Mississippi Uniform Commercial Code.

Worthington breached the implied warranty of merchantability contained in § 2–314 of the Mississippi Uniform Commercial Code. Worthington held itself out as having special knowledge and skill in the design and construction of pumps for oil tankers. The pumps it supplied to Litton, however, were not fit for their ordinary purpose.

Under § 2–315 of the Mississippi Uniform Commercial Code, Worthington breached its implied warranty that the pumps were fit for their particular purpose. Worthington knew the pumps were to be employed in aviation fuel and water removal in the clean tanker service. It knew that Litton was relying on its skill and judgment to furnish pumps which were suitable. The pumps it provided were not.

Litton claims that Worthington is liable for the cost of constructing houses on the decks of the "Falcon Duchess," "Falcon Countess" and "Falcon Princess" to cover the pump turbines and protect them from the elements. This claim is based upon a section of the pump technical specifications entitled "Coatings, Painting and Preserva-

tion." That section states in pertinent part:

"All external non-working surfaces of machinery subject to rusting or corrosion, and not covered by the above paragraph, shall be adequately painted or coated with a preservative finish suitable for equipment which will be installed on weather decks of ocean going vessels."

The Court agrees with Worthington that this is a painting specification. It does not obligate Worthington to supply housings for the turbines. A careful reading of that entire section of the technical specifications reveals that separate mechanical protection, like covers or housings, are required only to protect equipment during shipment and storage.

Worthington was responsible for suitably painting or coating those exposed turbine parts located on the tanker's weather deck. The evidence indicates that the coating Worthington used was incapable of protecting the turbines from corrosive effects of sea water.

Worthington is not liable for the cost of constructing protective housings. It is liable for the cost of repair of turbine parts inadequately protected, and it is liable for the cost of protecting the turbines by covering them with a paint, coating or preservative capable of satisfying the specifications. The Court is unable to specify the exact amount of this liability because no evidence was presented detailing the cost involved. The parties will be asked to submit supplemental evidence for the Court's consideration.

Worthington's defenses on the extent of damages are mostly without merit. The Court has already rejected Worthington's contention that an unnecessary double fix occurred where the priming valves were located and a separate stripping system was added, and the contention that Mr. Serrie's statements relieved Worthington from liability. At trial, Worthington questioned Litton's accounting procedures and its charge for overhead. Worthington did not press these arguments during briefing and the Court finds no merit to them.

Worthington claimed that any payment of overhead would be a windfall because Litton had already collected its overhead from all of its customers for all projects including the ones in question here. The testimony and Worthington's failure to brief this question may indicate that it has abandoned this defense. Nevertheless, the Court wishes to note that no persuasive evidence was introduced to substantiate this claim, and that it is rejected.

Worthington attacked Litton's accounting procedures and figures through the testimony of a Mr. Frank R. Giglio. Subsequent to the trial, Litton filed objections to Mr. Giglio's analysis. Worthington has not responded to these objections.

The Court agrees with Litton that Mr. Giglio's testimony and the exhibits he relied upon tend to contain what appear to be inaccuracies, misconceptions and misunderstandings. The evidence attests to the validity of Litton's figures and accounting procedures.

Finally, Worthington has repeatedly argued, both with respect to the expansion joint failures and with respect to the other causes of the pump failures, that Litton cannot be awarded damages where it merely estimates or approximates its costs. Worthington says Litton must establish exact costs or it cannot recover from Worthington. I find the correct rule to apply here in the case of *Koehring Company v. Hyde Construction Company, Inc.*, 254 Miss. 214, 178 So.2d 838, 853 (1965), where the Court stated:

"Although the method used in obtaining the measure of damages is not entirely without fault, it may be said, as a general rule, that a party who has broken his contract will not be permitted to escape liability because of the lack of a perfect measure of damages caused by his breach. Therefore, a reasonable basis for computation and the best evidence which is obtainable under the circumstances of the case, and which will enable the trier to arrive at a fair approximate estimate of loss is sufficient proof."

I find that Worthington is liable to Litton for the sum of $500,000 owed to Falcon. I further find that Worthington is liable to Litton for the $1,320,000.00 cost of relocating the priming valves and Worthington is liable to Litton for the "Marine Chemist" repairs totalling $95,000.00. Worthington also owes Litton $87,875.79 for the replacement of expansion joints. Worthington's present liability equals $2,002,875.79. As stated previously, Worthington's liabilities with regard to the protection of the pump turbines will be the subject of a further hearing.

## III

*Worthington's Claims Against Uniroyal*

Worthington seeks to hold Uniroyal liable for the amount of Worthington's liability to Litton that is attributable to the expansion joint failures. Uniroyal denies liability asserting several defenses. Pursuant to my earlier ruling on Uniroyal's motion for summary judgment, any award of damages will be " . . . measured by the terms of the Worthington purchase order . . ." *Falcon Tankers, Inc. v. Litton Systems, Inc.*, Del.Super., 355 A.2d 898, 908 (1976).

After persuading Litton to use expansion joints rather than "O" rings to absorb flexing and to connect the pump column with the suction can, Worthington negotiated with Uniroyal for the purchase of the joints. Uniroyal's engineering department told its sales office, "We have nothing to offer on JP4 or JP5. No quote." JP4 and JP5 were the aviation fuels the Falcon tankers would transport. Worthington was not informed of this engineering decision. Eventually, under pressure from its sales personnel, Uniroyal agreed to construct expansion joints made with a Buna-N tube. Uniroyal sent a price quotation to Worthington specifying joints constructed of Buna-N throughout.

Worthington sent a purchase order to Uniroyal which mistakenly requested " . . . special neoprene construction throughout . . ." Uniroyal, recognizing this mistake, altered the purchase order to read, " . . . Buna-N or our paracril construction throughout . . ." It is agreed that Buna-N is better suited than neoprene for the Falcon application because it is less susceptible to chemical attack by aviation fuel.

■ The purchase order became a binding contract between Worthington and Uniroyal after Uniroyal signed it as modified and returned it to Worthington. *Falcon Tankers, Inc. v. Litton Systems, Inc.*, Del. Super., 355 A.2d 898 (1976). Under the terms of the purchase order, Uniroyal expressly warranted that the joints would conform to the drawings, specifications, data or other description furnished or adopted by Worthington. Uniroyal warranted that the joints would be merchantable, would be free from defects in design, material or workmanship and would be fit for their intended purpose or use.

■ Uniroyal, in breach of the contract and its warranties, supplied non-conforming expansion joints. The joints were constructed with a neoprene outer cover and a Buna-N inner tube rather than all Buna-N as the contract required. Worthington discovered this substitution only after the joints began to fail.

Worthington asked Uniroyal to replace all the expansion joints with ones constructed entirely of Buna-N as the contract required. Uniroyal refused unless Worthington would write a letter, " . . . absolving Uniroyal for all responsibility both on service life of joints and any other possible charge." Uniroyal's refusal to honor the contract's express warranty of replacement without adding new conditions was a breach of contract.

Uniroyal attempts to explain this breach by asserting that it did not know the expansion joints were to be immersed in the cargo. Uniroyal also claims that Buna-N is not suitable for immersion in aviation fuels, and therefore, would have recommended metal expansion joints had Worthington informed it that the joints were to be immersed. The evidence persuades the Court otherwise.

Uniroyal knew the pumps were vertical and located on cargo ships. This meant it was at least conceivable the expansion joints would be located in the cargo tanks. Uniroyal obtained information on the below-deck temperatures. These temperatures would have been of little concern to Uniroyal unless it anticipated the expansion joints would be located below deck. During internal discussion, Uniroyal personnel reviewed the problems encountered on the "Molasses Ship." There, Uniroyal had been exposed to liability when its expansion joints ruptured while immersed in a cargo of molasses. The immersion problems of the "Molasses Ship" would have held no concern for Uniroyal, unless it anticipated the expansion joints would be immersed in the Falcon application.

Uniroyal knew Buna-N's poor adhesion qualities militated against using it for an entire expansion joint. Its desire, as expressed in the purchase order, to fabricate expansion joints entirely of Buna-N means that it felt a need to construct the outer cover out of a material able to withstand immersion in aviation fuels.

An expansion joint immersed in cargo is subjected to external pressure from the weight of the liquid in the tank. The fact that Worthington gave Uniroyal no external pressure figures may tend to indicate that Uniroyal was not informed of the joints' pending immersion. However, in light of the factors discussed above, the weight of the evidence shows that Uniroyal knew or should have known the expansion joints were to be immersed in aviation fuel. Also, Uniroyal did not follow its usual procedure for gathering information upon which to base its proposal. Uniroyal never asked Worthington for the pressure figures. No one from Uniroyal asked Worthington whether or not the joints would be immersed in spite of indications that such would be the case.

Uniroyal belatedly claimed that Buna-N was not suitable for the Falcon application and that metal expansion joints should have been used. The evidence suggests otherwise.

Uniroyal's own expert and former employee, Mr. John J. Millard, testified that metal has a shorter fatigue life than Buna-N. Metal does not endure exposure to salt water as well as Buna-N, and during Butterworthing, hot salt water is used to clean the tanks in preparation for loading new cargo. Uniroyal cites the "Naess Carbo-Tiger" as an example of a proper use of metal expansion joints. This example has limited value. Unlike the Falcon tankers, the "Naess Carbo-Tiger" transports many different types of chemicals and solvents, and as the evidence reveals, metal is the preferred material for expansion joints immersed in a variety of cargoes.

Two of Uniroyal's competitors Anchor Packing Co. and Mercer Rubber Co., recommended and supplied Buna-N replacements when the Uniroyal joints failed. The replacement joints that met the specifications have performed fairly well and have had a suitable service life. Buna-N's problem of adhesion and its vulnerability to light and ozone never seriously affected its performance on the Falcon tankers.

Uniroyal also contends that Worthington has failed to sustain its burden of proving by a preponderance of the evidence that Uniroyal's substitution of a neoprene outer cover proximately caused the expansion joint failures. Uniroyal recites other factors which it says account for the failures. The Court once again disagrees. These other factors are not plausible alternatives. At most, they may have accelerated the inevitable failure of some of the expansion joints. I find that Worthington has sustained its burden of proof.

I find that the use of neoprene, an unsuitable material, caused the expansion joint failures on the Falcon tankers. The fact that the joints on the "Falcon Lady" worked for approximately nine months before failing is consistent with Worthington's position that the neoprene outer cover deteriorated gradually under the chemical attack of aviation fuel.

Worthington gave Uniroyal the wrong bolt hole pattern for the expansion joints. In some cases, the pump columns were ro-

tated to compensate for this discrepancy. In others, new bolt holes were drilled to accommodate the expansion joints to the pump columns. In some of these latter cases, the old bolt holes were not filled or otherwise covered. Cargo seeping through these exposed bolt holes came into contact with the inside of the joint. Uniroyal asserts that cargo entering the expansion joint through unplugged, unvulcanized, unused bolt holes was a cause for the failures. I find, however, that this is not so.

The evidence does not indicate how many expansion joints suffered from exposed bolt holes. Only one can be substantially documented. Many expansion joints did not have exposed bolt holes and still failed. The evidence does support Uniroyal's contention that expansion joints made entirely from Buna-N would have eventually failed if continuously exposed to aviation fuel entering through unprotected bolt holes. This is not, however, a plausible explanation for the rapid, massive failure experienced here.

Uniroyal next contends that welding burns on some expansion joints allowed cargo to enter the joints' carcass. The evidence showed only two of the five original joints that failed on the "Falcon Lady" were burned by a welding torch during installation. Many joints failed which were not burned. The evidence also does not make it possible to determine whether these burns were superficial or whether they were a serious penetration of the cover which reached the inner carcass or tube. Since the neoprene outer cover of these joints would inevitably fail with exposure to jet fuel, welding burns would have affected only the speed with which failure occurred. They are not found to have brought about failure on their own. In fact, when the initial failures occurred, one of the burned joints, in contrast with some of the other joints with no burns, was considered serviceable.

Uniroyal also contends that Worthington provided it with improper expansion joint dimension. This meant the original joints were precompressed or over-compressed when installed. Joints suffering from over-compression are more apt to rupture from experience fatigue or stress failures. Once again, however, the great weight of the evidence convinces the Court that the use of neoprene, an unsuitable material, caused the expansion joints' failures.

The deleterious effects of over-compression, unplugged bolt holes and welding burns were not the predominate causes for the failures.

Uniroyal's neoprene expansion joints did not live up to the contract's warranties. They did not conform to specifications which required all Buna-N joints. They were not merchantable. They were not free from defects in workmanship. They were not fit for their intended purpose. As stated earlier, Uniroyal's refusal to replace the defective joints with suitable ones violated the contract's replacement requirement. Under the terms of the contract, Uniroyal is liable to Worthington for the cost of replacement. Litton obtained and paid for replacements. Under a previous holding of this Court, Worthington indemnified Litton for the cost of replacement. Uniroyal's liability to Worthington is $87,875.79 (an amount equal to Litton's cost for replacing the expansion joints). Uniroyal is not, however, liable for the cost of replacing expansion joints manufactured by its competitors. See *Falcon Tankers, Inc. v. Litton Systems, Inc.*, Del.Super, 355 A.2d 898 (1976).

## IV

### *Summary*

Litton is liable to Falcon in the amount of $500,000. Worthington is liable to Litton in the amount of $2,002,875.79 plus additional amounts yet to be determined. Uniroyal is liable to Worthington in the amount of $87,875.79.